690 A.2d 142

LINDA BLACK, INDIVIDUALLY, AS GENERAL ADMINISTRA-
TRIX AND AS ADMINISTRATRIX AD PROSEQUENDUM OF
THE ESTATE OF GERALD BLACK, DECEASED, PLAINTIFF–
RESPONDENT, v. SEABROOK ASSOCIATES, LTD., A PART-
NERSHIP, CDC FINANCIAL CORP., C.J. ACHEE AND/OR SEA-
BROOK HOUSING CORPORATION, DEFENDANTS–APPEL-
LANTS.

Superior Court of New Jersey
Appellate Division

Argued November 19, 1996—Decided March 19, 1997.

Before DREIER, WEFING and NEWMAN, JJ.

*Kevin P. McCann* argued the cause for appellants (*Chance & McCann,* attorneys, *Walter H. Iacovone,* of counsel and on the brief).

*Steven L. Rothman* argued the cause for respondent (*Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson,* attorneys, *Mr. Rothman,* of counsel and on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

Defendants appeal from a judgment entered in this wrongful death and survivorship action in the amount of $400,000, reduced to $240,000 based on the jury's finding that decedent, Gerald Black, was forty percent negligent. On appeal, defendants argue that the trial judge erred by refusing to admit evidence of decedent's blood alcohol level and the presence of cocaine metabolite in his system; that plaintiff's counsel's closing argument, branding defense counsel as a liar and making repeated references to missing maintenance records and statements, was unduly prejudicial; that the trial judge erred in refusing to provide an appropriate damage charge limiting the jury's award for pain and suffering, pecuniary injury and past and future lost earnings; and that the trial judge erred in his charge to the jury by incorporating administrative code provisions into the negligence charge. We reverse because evidence of decedent's drinking, which would have informed the jury on the issue of comparative negligence, was not admitted.

The facts of the accident are relatively straightforward. Decedent was a fruit-tree trimmer. He lived with his wife and three children in an apartment at the Buttonwood Village Housing Complex in Seabrook. On June 24, 1988, decedent did not go to work because it had rained earlier in the day. His wife, plaintiff Linda Black, remained home from work as well. During the afternoon, decedent went to an ice cream truck to buy his daughter an ice cream cone. On returning to his apartment, accompanied by his friend, Jack Johnson, decedent found that the rear door was stuck. According to the testimony of plaintiff Linda Black, the door had stuck in the past, especially in humid weather.

The door consisted of a wooden frame which contained a glass pane in its top half. Decedent attempted to open the door by striking it on the wooden area as he had done on prior occasions. He switched the ice cream cone from his left hand to his right, balled his fist and punched the door. He missed the wooden door frame and put his arm through the glass window. Upon removing

it, he cut his arm and severed the brachial artery on a shard of glass.

Jack Johnson and decedent's wife placed a tourniquet around decedent's arm. Paramedics transported decedent to Bridgeton Hospital. From there he was air-evacuated to Cooper Hospital, where he died within four hours of the accident.

Before the incident, decedent had consumed at least two seven-ounce bottles of Budweiser. While at Bridgeton Hospital and within forty minutes of the accident, decedent's blood was drawn and analyzed. The first blood serum reading showed .143 blood alcohol content and the second, .11. There was also a trace of cocaine metabolite in decedent's urine.

Prior to trial, plaintiff's counsel moved *in limine* to exclude any evidence of decedent's alcohol or cocaine use. The trial judge barred this evidence until such time as he heard from Dr. Kathryn O'Hara, an emergency physician who treated decedent at Bridgeton Hospital. Dr. O'Hara testified as to the post-accident conduct of decedent. She stated that decedent thrashed around, pulled out the IVs that had been inserted in his body and was very combative. Dr. O'Hara attributed decedent's conduct to shock and felt that alcohol was only a minor contributing factor to decedent's behavior. The trial judge determined that there was insufficient supplemental evidence of alcohol to admit such testimony. citing to the decision in *Gustavson v. Gaynor,* 206 *N.J.Super.* 540, 503 *A.*2d 340 (App.Div.1985), *certif. denied,* 103 *N.J.* 476, 511 *A.*2d 655 (1986). The trial judge further ruled that while evidence of decedent's blood alcohol level may have been relevant, its prejudicial effect substantially outweighed its relevancy.

Defendants raise several other issues on appeal. We briefly discuss the pertinent factual background.

During his closing argument to the jury, plaintiff's counsel stated:

> For four days, ladies and gentleman of the jury, you've heard accusations, out and out accusations of a crime from [defense attorney] against [plaintiff]. We are going to discuss that, because, of course, I have to address those issues. I'd rather

not; I would just rather get to the evidence. Now, before we discuss the evidence, the case is as clear as day; but I have to address these issues.

Number One, [defense attorney] starts out and accuses [plaintiff] of altering the birth certificates of her children to put Mr. Black's name on there. One, perjury; Two, a crime; Three, includes my office in a conspiracy—"I got those from your office"—a conspiracy to commit this crime.

Now, the question you have to ask, ladies and gentlemen, did [defense attorney] not know the answer to that question? Or, did he know the answer? He knew what the answer was; let's give him the benefit of the doubt. He knew the answer.

So what he does, he comes before you recklessly and accuses a witness of perjury of a crime without knowing the information. That occurred in the morning. I called my office by—after lunch, the original showed up · in this courtroom. That's the effort it took to find out whether or not you are going to accuse somebody of a crime of lying or perjury's true. You can go back and you've heard and you will have it when you go back, one it was changed because Gerald Lynn was spelled L–Y–N, instead of L–Y–N–N; and the other one was changed because of a typographical error at the hospital. That is the type of innuendo, accusation, and out and out lies [that defense attorney] has told you and I say that with deep regret, but I don't know how else to phrase that. He accused a client of falsifying, of having a child with another man, her husband's dead, having another man—and lying on the birth certificate and doing it purposely, either recklessly or totally in full knowledge. And this is—[defense attorney] stands before you and asks you to believe his version of what occurred.

. . . .

Those are the accusations and innuendoes. We can go through and I suggest to you, a litany, a litany of everything that [defense attorney] has accused my client of that has turned out to be false.

Defendants contend that plaintiff's counsel's remarks were highly prejudicial, unwarranted and inappropriately implied that his adversary was a liar.

With regard to the pecuniary loss of future earnings suffered by plaintiff and her children, no evidence was submitted to establish decedent's projected work life expectancy, nor was there a jury charge regarding decedent's life expectancy. The death certificate listed decedent's age as thirty-eight. Evidence regarding decedent's income came from plaintiff, who testified that decedent received $200 a week net pay of which he would supply her with $100 a week for household needs. Decedent's employment records indicated that he worked seasonally, for six months a year, and that he earned an average of $200 gross pay each week during that period of time.

Defense counsel also objected to the trial judge's jury interrogatory form. First, interrogatory number 7 did not provide a breakdown as to percentages of negligence between the several defendants; and second, interrogatory number 8 did not provide a means to apportion the damage award because it did not identify separate categories for pain and suffering, past lost earnings, future lost earnings and pecuniary damages. The trial judge did charge the jury regarding the separate elements of damages. Additionally, he made general reference to methods used to calculate future wage loss. He did not mention the worklife expectancy of decedent, nor was any testimony presented as to how long decedent expected to work. In connection with decedent's life expectancy, the trial judge only told the jury, "You know how old Gerald Black was."

The trial judge also instructed the jury on the reasonable maintenance of dwelling units. This instruction included language quoted from the New Jersey Administrative Code without reference to specific Code provisions or the fact that noncompliance with those provisions would violate the Code. Among these statements of law, the trial judge stated that, "All doors shall be maintained so that they can be readily opened and closed."

We agree that the trial judge erroneously denied admission of evidence of decedent's drinking prior to the accident and reverse on that ground alone.

Defendant argues that the trial judge erred in not admitting evidence of decedent's drinking prior to the accident. In barring the evidence of alcohol consumption, the trial judge focused on decedent's post-accident behavior rather than decedent's actions leading up to the accident. Dr. O'Hara addressed the cause of decedent's combative conduct after he had experienced a great loss of blood and was in obvious shock. Dr. O'Hara's observations and opinions related to decedent's condition following the severance of his brachial artery.

Dr. O'Hara's assessment does not take into account the impact that decedent's alcohol consumption had on the events leading up to his injury and subsequent death. When considering decedent's negligence, the court must decide whether the decedent was conducting himself or herself in a manner which created a heightened risk of physical injury. *Tose v. Greate Bay Hotel and Casino, Inc.*, 819 *F.Supp.* 1312, 1315 (D.N.J.1993) (citing *Hendrikson v. Koppers Co.*, 11 *N.J.* 600, 608, 95 *A.*2d 710 (1953); *Milstrey v. City of Hackensack*, 6 *N.J.* 400, 413–14, 79 *A.*2d 37 (1951); *Keller v. Frank Kull, Inc.*, 165 *N.J.Super.* 258, 398 *A.*2d 106 (App.Div.1978); *Citro v. Stevens Institute of Technology*, 55 *N.J.Super.* 295, 150 *A.*2d 678 (App.Div.1959)). In this setting, voluntary intoxication is not an excuse but rather is a factor used to determine whether alcohol impacted decedent's ability to perceive risks. *Ibid.* Intoxicated persons, like sober individuals, are held to the same standard of care of a reasonable person. *Ibid.* (citing *Allen v. Rutgers, State Univ. of New Jersey*, 216 *N.J.Super.* 189, 195, 523 *A.*2d 262 (App.Div.), *certif. denied*, 107 *N.J.* 653, 527 *A.*2d 472 (1987); *Anslinger v. Martinsville Inn, Inc.*, 121 *N.J.Super.* 525, 534, 298 *A.*2d 84 (App.Div.1972), *certif. denied*, 62 *N.J.* 334, 301 *A.*2d 449 (1973); *Tabor v. O'Grady*, 59 *N.J.Super.* 330, 339, 157 *A.*2d 701 (App.Div.1960)).

The facts reflect that decedent had difficulty opening the rear door to his apartment, which had a tendency to stick in humid weather. In order to open the door, he decided to strike the doorframe to gain entry into the apartment. He balled his fist and punched at the wooden frame. Evidence of decedent's consumption of alcohol is relevant with regard to an explanation of his actions in striking the wooden frame with a balled fist and his coordination in missing his stationary target. To what extent his judgment and/or coordination were impaired by what he consumed by way of alcohol that day was, therefore, a proper subject for the jury to consider.

Defendants could elicit such testimony from Jack Johnson, plaintiff and the blood alcohol content results of decedent's blood

serum analysis. This testimony was relevant to the issue of decedent's comparative negligence. The trial judge did not view the evidence in this context but mistakenly relied on Dr. O'Hara's testimony which addressed only the post-accident conduct of decedent. We do not question the trial judge's ruling as to Dr. O'Hara's testimony where alcohol was viewed as a minor contributing factor to decedent's post-accident conduct. The issue, however, properly focused, was decedent's pre-accident behavior. On this point, the relevance of alcohol consumption was probative and was not outweighed by any prejudice that might flow from it.

Even if the supplemental evidence standard of *Gustavson v. Gaynor, supra,* was to be applied, the available evidence satisfied that standard. In *Gustavson,* we recognized the public's concern for drunk drivers and established protection so that jurors do not overreact when allegations of drinking and driving are involved. 206 *N.J.Super.* at 546–47, 503 *A.*2d 340. No such special protection was necessary in this case. The public, representative of other drivers on the roadway and general pedestrian traffic, were not at risk by what decedent did in entering his own house. Thus, the potential for overreaction by a jury was absent. Also, the alcohol percentage to establish a DWI charge is irrelevant because the activity of entering or leaving one's home is entirely different from operating a motor vehicle. On retrial, this must be carefully explained to the jury.

With respect to the evidence of a trace of cocaine metabolite in decedent's urine, defendants' counsel received that report on the brink of trial and did not have an opportunity to develop it further. To do so will no doubt require expert testimony on the significance of what was found and how it may or may not have interacted with alcohol in the bloodstream. We do not address the issue further, but leave it to the trial judge to consider if and when any application to introduce such evidence is made.

Because we are reversing and remanding for a new trial, we briefly discuss the other issues raised by defendants. Plaintiff's counsel's closing argument, attacking defense counsel as a

liar and making repeated references to missing maintenance records and statements, was not prejudicial. Our careful review of the trial record discloses that defendants' counsel had raised the issue of the paternity of decedent's children without even knowing the nature of amendments to the birth certificates. The amendments concerned nothing more than a misspelling of Geraldine Lynn's name by leaving off an "n", and another clerical error with regard to the birth certificate of Fiona Black, which was amended almost two years before the date of the accident.

Defense counsel admitted that he did not know what the amendments were. However, defense counsel was obliged to know what the amendments were before he sought to question plaintiff about them. The amendments, as proven, were innocuous. Defense counsel had no business doing what he did, and he deserved what he received in the closing arguments from his adversary. While we do not approve of the "liar" label being pinned on any attorney, the deception promoted by defense counsel by not ascertaining the nature of the amendments before asking about them certainly invited the vigorous condemnation by plaintiff's counsel. *Henker v. Preybylowski*, 216 *N.J.Super.* 513, 524 *A.*2d 455 (App.Div.1987), and *Tabor v. O'Grady*, 59 *N.J.Super.* 330, 157 *A.*2d 701 (App.Div. 1960), cited by defendants, provide no comfort. Neither of those cases involved provocation by defense counsel. Here, it was defense counsel's conduct which invited the closing response by plaintiff. We find no prejudicial error. We would expect that this issue would not surface at all on a retrial because the trivial nature of the amendments to the birth certificates are now known.

Defendants attack the damage award. We need not address the quantum of damages in view of our reversal on liability. However, on retrial, the jury should not be permitted to speculate on decedent's worklife expectancy. No testimony was offered as to how long decedent expected to work. This is an essential element of proof to place before the jury in order for them to determine the likelihood that decedent would fulfill his worklife expectation. The same is true with respect to the life

expectancy. While the life expectancy jury charge is discretionary in terms of the jury accepting it, the charge does provide statistical guidance for a jury in assessing how long decedent might have been expected to live. The issue was further compromised by the lump-sum award asked for in the verdict sheet. Had the award been broken down to decedent's pain and suffering as a separate category of damages from the loss of financial contribution, counsel and guidance to plaintiff and the children, we might be in a better position to determine the effect of the absence of these charges on the quantum of the award. Too many sins are buried in a lump sum award, especially where, as here, separate causes of action existed for wrongful death and survivorship claims.

The trial judge also failed to follow the charge on discounting to present value. While we appreciate that there was no economic expert and the amount of money contributed to the household was modest by current economic standards, nonetheless, a charge molded more closely on the model charge would have been appropriate.

Lastly, defendant argues that the trial judge's charge incorporated standards set forth in Title 5 of the New Jersey Administrative Code and was, therefore, objectionable. The trial judge did not instruct the jury using the language applicable to statutory violations, nor did he refer to the specific code sections in quoting from the Code. The trial judge's use of the standards in the Code was, however, a correct statement of the law concerning a landlord's responsibility to a tenant. We find no error in this aspect of the charge.

Reversed and remanded for a new trial.