59 A.3d 576

NEW JERSEY DEPARTMENT OF CHILDREN AND FAMILIES,
DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–
RESPONDENT, v. A.L., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP
OF T.L. AND A.D., MINORS.

Argued September 10, 2012—Decided February 6, 2013.

4

*Clara S. Licata,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender Parental Representation, attorney; *Ms. Licata, Beatrix W. Shear* and *T. Gary Mitchell,* Deputy Public Defenders, of counsel and on the briefs).

*James D. Harris,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Children & Families, Division of Youth and Family Services (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz* and *Melissa H. Raksa,* Assistant Attorneys General, of counsel).

*Noel C. Devlin,* Assistant Deputy Public Defender, Law Guardian, argued the cause for Respondents T.L & A.D. (*Joseph E. Krakora,* Public Defender, attorney).

*Jeyanthi C. Rajaraman* argued the cause for *amicus curiae* Legal Services of New Jersey (*Melville D. Miller, Jr.*, President, attorney; *Ms. Rajaraman, Mr. Miller* and *Mary M. McManus–Smith*, on the brief).

*Lawrence S. Lustberg* argued the cause for *amici curiae* Experts and Advocates in Maternal and Fetal Health, Child Welfare, Public Health and Drug Treatment (*Gibbons*, attorneys; *Mr. Lustberg* and *Emma S. Ketteringham*, a member of the New York bar, on the briefs).

Chief Justice RABNER delivered the opinion of the Court.

This is a case of statutory interpretation. The question presented is whether a court can find "abuse" or "neglect" of a child under Title 9 if an expectant mother uses drugs during pregnancy but there is no evidence of actual harm when the baby is born. To determine the answer, we do not start with a clean slate. Instead, we interpret a comprehensive legislative scheme relating to child welfare and look to the language of the relevant statutes.

"Abuse" and "neglect" are carefully defined in the law. *N.J.S.A.* 9:6–8.21(c). The statute in question addresses harm to a child, not a fetus. If an expectant mother's drug use causes actual harm to the physical, mental, or emotional condition of a newborn child, a finding of abuse or neglect is appropriate. If there is no evidence of actual harm, though, the statute requires a showing of "*imminent* danger" or a "*substantial* risk" of harm before a parent or guardian can be found to have abused or neglected a child. *Ibid.* (emphases added).

To meet that threshold, the New Jersey Division of Child Protection and Permanency (Division)[1] must present sufficient proof of harm at a fact-finding hearing in contested cases. In this

[1] On June 29, 2012, the New Jersey Division of Youth and Family Services (DYFS) was renamed the Division of Child Protection and Permanency. *See L.* 2012, *c.* 16, § 20 (amending *N.J.S.A.* 9:3A–10(b)). The record and prior decisions in this case refer to the Division as DYFS. We use the terms interchangeably.

case, the Division conceded that there was no evidence of actual harm to the newborn. To show risk of harm, the Division presented a series of documents but no testimony. The critical documents revealed that the mother tested positive for cocaine upon admission to the hospital. They also showed the presence of cocaine metabolites in the baby's meconium, or first stool. The baby's health was otherwise normal, and he was discharged from the hospital after two days.

We find that the records alone did not prove imminent danger or a substantial risk of harm to the newborn child. The records, without more, revealed little about the degree of future harm posed to the newborn, which is the statute's critical focus in this case. As a result, the Division did not carry its burden of proof to establish abuse or neglect under Title 9. We therefore reverse the judgment of the Appellate Division, which affirmed the trial court's finding of abuse or neglect.

In the future, the Division can prevail in Title 9 proceedings if it presents evidence of actual harm or stronger proof of imminent danger to a child, as discussed more fully below. The Legislature has also provided two additional bases to protect children in these circumstances: (1) the Division can offer services to expectant and new mothers under certain circumstances, with their consent, *see* *N.J.S.A.* 30:4C–11; and (2) the Division can seek a court order to intervene and require a mother to undergo treatment, or seek other relief, if the best interests of the child so require, *see* *N.J.S.A.* 30:4C–12.

I.

A.L. gave birth to a son, A.D., at 2:16 a.m. on September 10, 2007. When she was admitted to the hospital earlier that day, she tested positive for cocaine. The hospital tested A.D.'s urine two hours after birth, and the results were negative for cocaine. A test of A.D.'s meconium, or first stool, later the same day revealed the presence of "cocaine metabolites."

The hospital promptly contacted the Division and reported the mother's positive drug screen. In response, the Division immediately started an investigation.

We glean the following facts from the exhibits the Division introduced at a fact-finding hearing. At some point on September 10, a Division caseworker spoke with a social worker at the hospital, who reported that on May 16, 2007, A.L. had tested positive for marijuana. The hospital had tested A.L.'s urine while treating her in her fifth month of pregnancy.

Early in the afternoon of September 10, the Division interviewed T.L., A.L.'s son from a different relationship, who was then five years old. At the time, A.L., T.L., and the newborn's father, T.D., all lived with A.L.'s parents. T.L. did not identify any problems at home. The report notes that he was dressed appropriately and was well-groomed.

The Division then met with A.L. and T.D. at the hospital. A.L. denied ever using drugs. She claimed that two days earlier, she and T.D. had picked up an intoxicated friend from a bar. The friend sat in the back seat of the car. When A.L. saw the friend pull out a plastic bag that appeared to contain cocaine and start to use it, she claims that she tried to grab the bag to get rid of it. According to A.L., the bag exploded, and the cocaine spilled all over her and the car. She claimed that she may have ingested cocaine from the incident.

With regard to the positive marijuana screen four months earlier, A.L. explained that she worked at a pharmacy and had delivered medication to a customer who suffered from cancer and AIDS. A.L. claimed that the customer was smoking marijuana when she made the delivery, and she smelled the marijuana from the doorway. She said the delivery must have been the cause of the positive drug test.

T.D., in a separate interview, also denied using drugs and corroborated A.L.'s story about how she might have ingested cocaine two days before. The Division also met with A.L.'s

parents, with whom she lived, and conducted a safety assessment at the family home. Among other things, the caseworker reported that the baby "was well groomed and appeared to be well cared for physically" on September 10.

The Division's Investigation Summary concluded that the allegation of neglect against A.L. was substantiated and that a safety protection plan was required. The report assessed the risk of neglect as "1," the risk level as "low," and the risk of abuse as "0." All parties agreed to a Safety Protection Plan on September 11, 2007, which required A.L.'s parents to supervise her contacts with both of her children.

Meanwhile, the hospital records for the same period describe A.D.'s condition. A "Newborn Physical Exam" reports that his Apgar scores, which measure a baby's health at birth, were 8 and 9 out of 10. Checks done of sixteen categories—including various organs, neurological reflexes, and the baby's appearance—were all "normal" after birth, the following day, and again at discharge. The records note that A.D. appeared jaundiced on September 12. He was discharged the same day, two days after birth.

The hospital records also include the results of various tests performed. A.D.'s urine toxicology screen was negative for all substances tested, including cocaine. A.D.'s stool toxicology tested positive for cocaine. That report states the following: "Confirmed POSITIVE by GC/MS for cocaine use by the presence of the following cocaine metabolite(s): Benzoylecgonine = 88 ng/g." A blood glucose record describes the patient as "jittery," but it is not clear whether the notation refers to A.L. or A.D. (The trial judge made no findings about the document and did not rely on it.)

On October 9, 2007, the Division filed a verified complaint for care and supervision of A.D. and T.L., pursuant to *N.J.S.A.* 9:6–8.21 and *N.J.S.A.* 30:4C–12. The trial court signed an order to show cause on October 15, 2007, which provided certain interim relief. It granted the Division care and supervision of the children, required that A.L. have supervised contact with them, and ordered A.L. to attend a drug and alcohol evaluation and cooper-

ate with random urine screens. The order also required the baby's father, T.D., to provide random urine screens.

On the return date of the order to show cause, November 7, 2007, the trial court continued the interim relief. Legal custody of T.L., the older child, continued with his maternal grandparents. Legal custody of A.D. remained with A.L. and T.D., with A.L.'s visitation to be supervised by T.D. and the child's maternal grandparents. In an order filed on March 8, 2008, all restrictions on A.L.'s contact with her children were lifted.

Central to this appeal, the trial court held a fact-finding hearing on April 3, 2008. At the outset, T.D., the baby's father, stipulated that "he [was] a family in need of services," and the court entered an order to that effect, pursuant to *N.J.S.A.* 30:4C-12.

The Division moved for a finding of abuse or neglect against A.L. under *N.J.S.A.* 9:6-8.21. As discussed further below, the statute requires the Division to show that A.D.'s "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of [A.L.'s] failure ... to exercise a minimum degree of care ... by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof...." *N.J.S.A.* 9:6-8.21(c)(4)(b).

The Division did not present any witnesses at the fact-finding hearing. Instead, the agency introduced seven documents. The first four are summarized above and consist of the following: (1) a Screening Summary, which summarized the hospital referral; (2) the Investigation Summary, which recounted the interviews described above; (3) the Safety Protection Plan; and (4) the hospital records.

The final three documents related to T.D., the newborn's father. They had no bearing on the trial court's findings about A.L. and are not relevant to this appeal.

Those seven documents comprise all of the evidence presented at the hearing. The Division made no allegations and presented no evidence against A.L. relating to her behavior during the

nearly seven months since the child's birth. The hearing instead focused on A.L.'s prenatal drug use.

The Division conceded that this was not "a case where they could prove actual harm to the child, because of the documents." Rather, the agency asserted that there was a substantial risk of harm to A.D. "because of the positive screen by [A.L.], because of the positive screen on the child, and because of the environment [to which] the child would be going home."

A.L. argued that the Division had not met its burden of proof to show actual harm or risk of harm. She contended that Title 9 does not apply to a fetus and that evidence of prenatal drug use, without complications after birth, cannot support a finding of abuse or neglect.

The Law Guardian, appointed to represent the interests of T.L. and A.D., agreed that the Division had not presented sufficient evidence to show abuse or neglect. In the view of the Law Guardian, the proofs were "better suited" for relief under Title 30.

On April 23, 2008, the trial court issued its ruling. The judge found that DYFS had satisfied its burden under Title 9 by a preponderance of the evidence. The court noted that A.L. had "abused or neglected the child [ ] in that he was exposed to a substantial risk of harm by being born with cocaine in his system." The court therefore entered an order of abuse and neglect against A.L., pursuant to *N.J.S.A.* 9:6–8.21(c)(4)(b).

In an accompanying written decision, the trial court found that A.L.'s explanation for her positive cocaine screen was "preposterous." The judge also acknowledged that DYFS had not introduced proof of any "ill effects" on the newborn—that is, there was no evidence of actual harm to the child after birth. After the court distinguished certain decisions from Title 30 cases, it concluded that A.L.'s "prenatal drug use, without more, when corroborated by [A.D.'s] positive meconium testing, *is* sufficient to establish by a preponderance of the evidence that A.D. is an 'abused or neglected child' " under *N.J.S.A.* 9:6–8.21(c)(4)(b).

A.L. appealed. While the appeal was pending, proceedings continued in the Family Part with periodic hearings and compliance reviews. In response to A.L.'s continued progress over time, the Division ultimately terminated the litigation by consent on June 23, 2010, because the conditions had been remediated. A.L. then had legal and physical custody of A.D. and continued to share custody of T.L. with her parents. That outcome highlights both A.L.'s improvements and the Division's commendable efforts during the course of this matter.

In an unpublished opinion dated June 10, 2011, the Appellate Division affirmed the trial court's finding of abuse and neglect.[2] The panel concluded that "A.L.'s use of cocaine two days before A.D.'s birth created the very risk of harm that *N.J.S.A.* 9:6–8.21(c)(4)(b) is designed to prevent." Citing to the Criminal Code, the panel noted that the Comprehensive Drug Reform Act, *L.* 1987, *c.* 106, and its policy to combat the effects of narcotics and protect children from drug trafficking, informed the court's decision.

The panel also relied on *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 736 *A.*2d 1246 (1999), for its statement that prenatal drug use "can result in life-threatening cardiovascular and central nervous system complications, low birth weight, lower gestational age at delivery, irritability, convulsions, poor feeding patterns, increased tremulousness and startles," *id.* at 350, 736 *A.*2d 1246 (citations omitted). But the panel distinguished the statement in *K.H.O.* that "[d]rug use during pregnancy, in and of itself, does not constitute a harm to the child under *N.J.S.A.* 30:4C–15.1(a)(1)." *Id.* at 349, 736 *A.*2d 1246. Because of the "vastly different objectives of a Title 9 abuse and neglect case . . . and a Title 30

---

[2] The opinion also affirmed a second, unrelated judgment of abuse and neglect against A.L. entered on March 4, 2010. That ruling stemmed from a finding that A.L. allowed the baby's father, T.D., access to the children without an approved supervisor, in violation of a court order. A.L. did not challenge the second judgment before this Court.

guardianship case" like *K.H.O.*, the panel did "not deem the dicta in *K.H.O.* to have a bearing on the issue before" it.

The panel also rejected A.L.'s argument that exposure of a fetus to cocaine is not a recognized harm under Title 9, without proof of risk of harm to the child after birth, because "[f]ollowing his birth, A.D. was not a fetus, but was instead a living child born with a dangerous drug in his body because his mother used cocaine while pregnant with him."

On June 27, 2011, the Appellate Division denied A.L.'s motion for reconsideration. A.L. had argued that the language in *K.H.O.*—that drug use during pregnancy alone does not constitute harm—was not dicta in light of *State v. Rose*, 206 *N.J.* 141, 19 *A.*3d 985 (2011). In an order, the panel explained that it had distinguished, not disregarded, *K.H.O.*

We granted A.L.'s petition for certification. 208 *N.J.* 372, 29 *A.*3d 744 (2011). We also granted motions to participate as amicus curiae from Legal Services of New Jersey (LSNJ) and Experts and Advocates in Maternal and Fetal Health, Child Welfare, Public Health, and Drug Treatment (Experts and Advocates), a group comprised of dozens of interested organizations and experts.

## II.

A.L. urges this Court to reverse the finding of abuse and neglect against her and presents a number of supporting arguments: that *N.J.S.A.* 9:6–8.21(c)(4) does not apply to a fetus or a pregnant woman absent harm or imminent risk of harm to a child after birth; that the principle set forth in *K.H.O.*—that drug use during pregnancy, without more, cannot establish harm in a termination of parental rights case—should control in abuse and neglect actions; that the Division did not present evidence at the fact-finding hearing that could have formed a basis for finding impairment or imminent risk of harm by prenatal exposure to drugs; that no expert testimony established that the mere presence of cocaine metabolites either harmed the child or placed him

in imminent danger; that *N.J.S.A.* 30:4C–12 could have met the goal of providing services in this case; and that the Appellate Division's decision will harm children because it will discourage pregnant women from seeking prenatal care.

The Division contends that the trial court's intervention under Title 9 was entirely proper and argues as follows: that A.L.'s intentional and reckless conduct, which caused her son to be born positive for cocaine, placed him in imminent danger of becoming impaired and constituted abuse and neglect; that the great weight of scientific evidence and other sources support a finding that prenatal exposure to cocaine constitutes abuse and neglect under Title 9; that the Division properly intervened only after the child's birth; that *K.H.O.* does not govern the outcome in abuse and neglect matters; and that expert testimony is not necessary to demonstrate that exposing a newborn to cocaine creates a substantial risk of impairment because that risk is within the realm of common knowledge.

The Law Guardian, on behalf of A.L.'s two children, argues that only Title 30 provides a basis for intervention in this case and points to *N.J.S.A.* 30:4C–11 and –12. The Law Guardian also relies on *K.H.O.* and submits that this Court has already decided that ingestion of illegal substances, without more, does not establish harm in the context of an abuse and neglect action.

Amicus LSNJ urges this Court to reverse the judgment of abuse and neglect and clarify that Title 9 requires evidence that a child is in imminent danger of becoming impaired. LSNJ notes that child welfare cases commonly involve parents with substance abuse issues and that, as a result, courts should assess the nature of a parent's dependency and whether the parent would expose a child to future harm. LSNJ outlines a series of factors it believes courts should consider in that regard before making a finding of abuse or neglect. The factors include a parent's history of treatment for substance abuse, the presence of mental health issues, the availability of family and community support for the family,

and other items. A.L. argues that such additional inquiries are proper only after a court has found abuse or neglect.

Amici Experts and Advocates are a group of organizations, experts, policymakers, and advocates in the fields of maternal and fetal health, child welfare, public health, and drug treatment. They contend that the trial and appellate courts relied on discredited science and erroneously construed *N.J.S.A.* 9:6–8.21. They maintain that scientific evidence is required to support a claim that drugs taken during pregnancy caused or are likely to cause harm under the statute, and that the Division failed to present qualified expert testimony to show that prenatal exposure to cocaine caused harm or imminent danger in this case. Amici assert that the use of cocaine during pregnancy does not automatically equate to abuse or neglect. They also contend that current research does not support the conclusion that exposure to cocaine poses a greater risk to a fetus than many other actions.

Amici warn that the improper expansion of Title 9 to pregnant women will harm newborn children by deterring some women from seeking prenatal care. They contend that such an expansion of the law is likely to harm low-income and minority communities in a disproportionate way.

After oral argument, we asked all counsel to submit supplemental briefs about the scope of *N.J.S.A.* 30:4C–11, which expressly applies to unborn children. We asked what the Division was empowered to do under that statute in response to a referral about an expectant mother's use of drugs. The parties, Law Guardian, and both amici agree that the law enables the Division to act only when a parent or guardian consents to accept services. *N.J.S.A.* 30:4C–12, which does not contain any reference to an unborn child, allows the Division to seek a court order that would require a mother to accept services and undergo treatment.

### III.

To provide a backdrop for this case, we briefly review the framework for New Jersey's child welfare laws. The statutes

balance between two competing interests: a parent's constitutionally protected right "to raise a child and maintain a relationship with that child, without undue interference by the state," *N.J. Div. of Youth & Family Servs. v. E.P.*, 196 *N.J.* 88, 102, 952 *A.*2d 436 (2008); and "the State's *parens patriae* responsibility to protect the welfare of children," *K.H.O., supra,* 161 *N.J.* at 347, 736 *A.*2d 1246.

Two parallel statutory schemes address those concerns. Title 9 governs acts of abuse and neglect against a child. *N.J. Div. of Youth & Family Servs. v. P.W.R.*, 205 *N.J.* 17, 31, 11 *A.*3d 844 (2011). It provides interim relief for children at risk and outlines the standards for abuse and neglect proceedings against parents and guardians. Title 30 controls guardianship proceedings in which the Division seeks to terminate parental rights. *See N.J. Div. of Youth & Family Servs. v. R.D.*, 207 *N.J.* 88, 110–11, 23 *A.*3d 352 (2011). Title 30 also empowers the Division to seek temporary care and custody of a child who is part of a family in need of services. *See N.J.S.A.* 30:4C–12.

Title 9's purpose is clear: to protect children "who have had serious injury inflicted upon them" and make sure they are "immediately safeguarded from further injury and possible death." *N.J.S.A.* 9:6–8.8(a). The law's "paramount concern" is the "safety of the children," *ibid.,* and "not the culpability of parental conduct," *G.S. v. N.J. Div. of Youth & Family Servs.*, 157 *N.J.* 161, 177, 723 *A.*2d 612 (1999) (citation omitted). The focus in abuse and neglect matters, thus, is on promptly protecting a child who has suffered harm or faces imminent danger. *See N.J.S.A.* 9:6–8.21(c)(4).

When a Title 9 action starts with the filing of a complaint, as in this case, a court may enter preliminary orders for the protection of the child pursuant to *N.J.S.A.* 9:6–8.31(a), (c). Courts then conduct a fact-finding hearing to determine whether a child has been abused or neglected. *N.J.S.A.* 9:6–8.44. "[O]nly competent, material and relevant evidence" can be admitted at the hearing. *N.J.S.A.* 9:6–8.46(b). In a typical case, a number of case manage-

ment conferences occur before the hearing. *N.J. Div. of Youth & Family Servs. v. G.M.*, 198 *N.J.* 382, 398, 968 *A.*2d 698 (2009).

If the court finds abuse or neglect, it may order further relief and direct the Division to provide needed services to protect the child and rehabilitate and improve the family's life. *N.J.S.A.* 9:6–8.50(d), (e). The court may hold a dispositional hearing immediately after the fact-finding hearing or at a later time. *N.J.S.A.* 9:6–8.47; *G.M., supra*, 198 *N.J.* at 399, 968 *A.*2d 698.

Title 30 also focuses on the need "to provide services to at-risk children and families in order to prevent harm to their children." *N.J.S.A.* 30:4C–1.1(a). Under *N.J.S.A.* 30:4C–11, the Division can offer services to parents, including expectant mothers, with their consent, in response to an application. *N.J.S.A.* 30:4C–12 allows for "intervention by the Division . . . to protect a child who, although not abused or neglected, is in need of services to ensure its health and safety." *N.J. Div. of Youth & Family Servs. v. T.S.*, 426 *N.J.Super.* 54, 64, 42 *A.*3d 942 (App.Div.2012).

In addition, Title 30 provides for guardianship actions that may result in the termination of parental rights, after which a child is eligible for adoption. *R.D., supra*, 207 *N.J.* at 118, 23 *A.*3d 352. The Legislature has outlined a methodical process, guided by what is in the "best interests of the child," for courts to decide Title 30 guardianship cases. *See N.J.S.A.* 30:4C–15.1(a); *R.D., supra*, 207 *N.J.* at 114, 23 *A.*3d 352.

## IV.

We next consider the scope and requirements of the statute that governs abuse and neglect proceedings, as well as the consequences that flow from a finding of abuse or neglect.

## A.

*N.J.S.A.* 9:6–8.21(c) defines an "abused or neglected child" with precision as

a child less than 18 years of age ... whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian ... to exercise a minimum degree of care ... in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof. . . .
[*N.J.S.A.* 9:6–8.21(c)(4)(b).]

 Our task in interpreting this law is to determine and give effect to the Legislature's intent. *Allen v. V & A Bros., Inc.*, 208 *N.J.* 114, 127, 26 *A.*3d 430 (2011). To do so, we look first to the plain language of the statute. *DiProspero v. Penn*, 183 *N.J.* 477, 493, 874 *A.*2d 1039 (2005). If the language is ambiguous, courts can examine extrinsic evidence, including legislative history, for guidance. *Murray v. Plainfield Rescue Squad*, 210 *N.J.* 581, 592, 46 *A.*3d 1262 (2012). Related parts of an overall statutory scheme can also provide relevant context. *See ibid.; In re Petition for Referendum on City of Trenton Ordinance 09–02*, 201 *N.J.* 349, 359, 990 *A.*2d 1109 (2010); *see also N.J.S.A.* 1:1–1.

### B.

 The language of the abuse and neglect statute reveals that it applies to a child and not a fetus. The definitional language in *N.J.S.A.* 9:6–8.21 declares that an " '[a]bused or neglected child' means a child less than 18 years of age." *See also N.J.A.C.* 10:129–1.3 (agency regulation using same definition for "abused or neglected child" and defining "child" as "a person *from birth* to his or her 18th birthday" (emphasis added)). Earlier in Title 9, in a chapter relating to the "Care, Custody, Guardianship and Support of Children in General," the word "child" is similarly defined as "any person under 18 years of age." *N.J.S.A.* 9:2–13(b).

Elsewhere, the Legislature explicitly extended protection to an "unborn child." As noted earlier, *N.J.S.A.* 30:4C–11 authorizes the Division to provide services, with a mother's consent, in response to an application—including "an application on behalf of an unborn child." Had the Legislature meant to apply Title 9 to an unborn child, it could have used the words it inserted at *N.J.S.A.* 30:4C–11. Its decision not to do so is entitled to respect.

*See INS v. Cardoza–Fonseca,* 480 *U.S.* 421, 432, 107 *S.Ct.* 1207, 1213, 94 *L.Ed.*2d 434, 448 (1987) ("[Where] Congress includes particular language in one section of the statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation and internal quotation marks omitted)); *State v. Scott,* 429 *N.J.Super.* 1, 6–7, 55 *A.*3d 728 (App.Div.2012) (citations omitted); *see also* 3A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 72:3 at 802 (7th ed. 2010) ("Courts read every word in a statute as if it was deliberately chosen and presume that omitted words were excluded purposefully.").

Absent evidence of clear legislative intent, court decisions in New Jersey have declined to extend the reach of a statute to an unborn child when the statute refers to a "person" or a "child." *See Giardina v. Bennett,* 111 *N.J.* 412, 420–22, 545 *A.*2d 139 (1988) (holding that Legislature's use of word "person" in Wrongful Death Act did not provide for recovery on behalf of stillborn infant or fetus); *N.J. Div. of Youth & Family Servs. v. L.V.,* 382 *N.J.Super.* 582, 590, 889 *A.*2d 1153 (Ch.Div.2005) (noting that because abuse and neglect statute in Title 9 "does not expressly include a fetus in its definition of a child, its protection does not extend to the child before birth"); *Croswell v. Shenouda,* 275 *N.J.Super.* 614, 621, 646 *A.*2d 1140 (Ch.Div.1994) ("[T]he Legislature does not mean fetuses when it refers to 'children', and when it wants to include fetuses it does so specifically and unambiguously."); *see also Acuna v. Turkish,* 192 *N.J.* 399, 416–19, 930 *A.*2d 416 (2007) (citing *Giardina* with approval), *cert. denied,* 555 *U.S.* 813, 129 *S.Ct.* 44, 172 *L.Ed.*2d 22 (2008). Other state courts have reached the same conclusion. *See, e.g., Starks v. State,* 18 *P.*3d 342, 348 (Okla.2001) (holding that "Oklahoma Children's Code does not apply to a fetus" because legislature "would have used ... specific terms" had it intended Code "to apply to a fetus or to a pregnant woman"); *State of Wis. ex rel. Angela M.W.,* 209 *Wis.*2d 112, 561 *N.W.*2d 729, 736 (1997) (holding that Wisconsin child welfare law does not include fetus because "the legislature has not

expressly provided that a fetus is a 'child' under the Code"). *But see Ex Parte Ankrom*, —— *So*.3d ——, —— – ——, 2013 WL 135748 (Ala.2013).

Because the abuse and neglect statute, by its terms, does not extend to a fetus, the law's protection is limited to the condition of a child after birth. *See L.V., supra*, 382 *N.J.Super.* at 590, 889 *A*.2d 1153. The behavior of an expectant mother during pregnancy can still be relevant if it relates to a child's suffering or the risk of harm to a child after birth. We now turn to that issue.

## C.

In this case, the primary question under Title 9 is whether A.D., as a newborn, "ha[d] been impaired" or was in "imminent danger of becoming impaired" as a result of his mother's failure to exercise a minimum degree of care by unreasonably inflicting harm or allowing a "substantial risk" of harm to be inflicted. *See N.J.S.A.* 9:6–8.21(c)(4)(b). In short, evidence of actual impairment to the child will satisfy the statute, but in a case where there is no such proof, the critical focus is on evidence of imminent danger or substantial risk of harm. The statute does not cover a past risk of harm during pregnancy, which did not materialize.

The Division bears the burden of proof at a fact-finding hearing and must prove present or future harm to a child by a preponderance of the evidence. *N.J.S.A.* 9:6–8.46(b).

The Division can show that a newborn has been impaired in a number of ways. For example, proof that a child is suffering from withdrawal symptoms at birth could establish actual harm. *See, e.g., K.H.O., supra*, 161 *N.J.* at 349, 736 *A*.2d 1246 (noting in context of termination of parental rights action that "a child born addicted to drugs and suffering from the symptoms of drug withdrawal as a result of her mother's substance abuse during pregnancy has been harmed by her mother and that harm endangers the child's health and development"). In addition, the Division can prove actual harm by showing

evidence of respiratory distress, cardiovascular or central nervous system complications, low gestational age at birth, low birth weight, poor feeding patterns, weight loss through an extended hospital stay, lethargy, convulsions, or tremors. *See id.* at 350, 736 *A.*2d 1246 (citations omitted); *see also In re Troy D.,* 215 *Cal.App.*3d 889, 263 *Cal.Rptr.* 869, 877 (1989) (discussing various factors). That information may come from any number of competent sources including medical and hospital records, health care providers, caregivers, or qualified experts.

 In the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm. *See N.J.S.A.* 9:6–8.21(c)(4)(b). A court "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." *In re Guardianship of D.M.H.,* 161 *N.J.* 365, 383, 736 *A.*2d 1261 (1999). Once again, the statutes direct that the Division must show *imminent* danger or a *substantial* risk of harm to a child by a preponderance of the evidence. *N.J.S.A.* 9:6–8.21(c)(4)(b), –8.46(b).

 Proof that a child's mother frequently used cocaine or other dangerous substances during pregnancy would be relevant to that issue. But not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect in light of the specific language of the statute. The proper focus is on the risk of substantial, imminent harm to the child, not on the past use of drugs alone.[3]

---

[3] We note that unlike New Jersey law, some state child welfare statutes have gone further and specify that prenatal drug use alone can establish harm or neglect. *See, e.g.,* Fla. Stat. § 39.01(32)(g)(1) (" 'Harm' to a child's health or welfare can occur when any person ... [e]xposes a child to a controlled substance or alcohol. Exposure to a controlled substance or alcohol is established by .. [a] test, administered at birth, which indicated that the child's blood, urine, or meconium contained any amount of .. a controlled substance or metabolites of such substances ..."); 705 Ill. Comp. Stat. 405/2–3(1)(c) ("Those who are neglected include ... any newborn infant whose blood, urine, or meconium contains any amount of a controlled substance ... or a metabolite of a controlled substance. .."); Minn.Stat. § 626.556(6) ("Neglect" includes

The Appellate Division recently reached a similar conclusion in *N.J. Div. of Youth & Family Servs. v. V.T.*, 423 *N.J.Super.* 320, 331–32, 32 *A.*3d 578 (App.Div.2011). In that case, the trial court found that a father neglected his child based on the father's refusal to attend substance abuse treatment and two positive drug tests for cocaine and marijuana during supervised visits. *Id.* at 325–27, 32 *A.*3d 578. DYFS presented no evidence of actual harm and no expert evidence that the father posed a risk during visits with the child. *Id.* at 331, 32 *A.*3d 578.

The Appellate Division reversed the finding of abuse and neglect. It noted that "[a]ddiction is not easy to successfully remediate; a failure to successfully defeat drug addiction does not automatically equate to child abuse or neglect." *Ibid.* The panel explained that even though drug use is illegal, "Title 9 is not intended to extend to all parents who imbibe illegal substances at any time. . . . [N]ot all instances of drug ingestion by a parent will substantiate a finding of abuse or neglect." *Id.* at 331–32, 32 *A.*3d 578.

A.L. also points to *K.H.O.* in support of her position that evidence of drug use alone is not enough to show harm. She relies on the Court's statement that "[d]rug use during pregnancy, in and of itself, does not constitute a harm to the child under *N.J.S.A.* 30:4C–15.1(a)(1)." *See K.H.O., supra,* 161 *N.J.* at 349, 736 *A.*2d 1246.

The child in *K.H.O.* was born with serious health problems; she suffered from heroin withdrawal, cleft palate syndrome, and respiratory problems. *Id.* at 344, 736 *A.*2d 1246. In response, DYFS sought to terminate the parent's rights under Title 30. *Id.* at 343, 736 *A.*2d 1246.

---

"prenatal exposure to a controlled substance, used by the mother for a nonmedical purpose, as evidenced by . . . results of a toxicology test performed on the mother at delivery or the child at birth. . . ."). As discussed earlier, New Jersey's abuse and neglect law outlines a different standard and requires proof of actual harm, or imminent danger or substantial risk of harm to a child's physical, mental, or emotional condition. *See N.J.S.A.* 9:6–8.21(c)(4)(b).

Permanent termination of parental rights is the ultimate intrusion on the right to raise a child. As a result, the Division's burden of proof is higher than under Title 9. To prevail in a Title 30 guardianship action, the Division must offer clear and convincing evidence that satisfies a four-prong statutory test, *see N.J. Div. of Youth & Family Servs. v. F.M.*, 211 *N.J.* 420, 447, 48 *A.*3d 1075 (2012); *N.J.S.A.* 30:4C–15.1(a)—a higher threshold than the preponderance standard in abuse and neglect hearings. With regard to the first prong of the test, which addresses the child's safety, the Division must prove harm that "threatens the child's health and will likely have continuing deleterious effects on the child." *K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246. Title 30 guardianship cases, thus, often address long-term problems that affect a child's welfare. Title 9, by contrast, allows for immediate intervention when a single instance of conduct harms or threatens substantial harm to a child. *N.J.S.A.* 9:6–8.21(c)(4)(b); *see also R.D., supra,* 207 *N.J.* at 118, 23 *A.*3d 352 ("Title Nine proceedings are geared towards an interim form of relief—removal of the child from immediate harm.").

Because of the key differences between Title 30 guardianship actions and Title 9 abuse and neglect proceedings, *K.H.O.* is not dispositive here. But the decision properly highlights the importance of demonstrating some form of actual or threatened harm to a child, which both Titles require. Indeed, after the Court in *K.H.O.* explained that prenatal drug use alone did not constitute harm to a child under Title 30, the Court noted that a mother's drug use during pregnancy *does* cause harm under the law when it results in a newborn suffering from the results of addiction. *K.H.O., supra,* 161 *N.J.* at 350, 736 *A.*2d 1246.

D.

If the Division can prove abuse or neglect, that finding has "significant consequences." *N.J. Div. of Youth & Family Servs. v. N.S.,* 412 *N.J.Super.* 593, 619, 992 *A.*2d 20 (App.Div. 2010). The court can enter a dispositional order that places the

child in the custody of a relative or another suitable person for a substantial period of time. *See N.J.S.A.* 9:6–8.50(d), –8.51(a), –8.54(a). The Division can also bring an action to terminate parental rights, which may rely on a Title 9 judgment. *See N.J.S.A.* 30:4C–15(a); *R.D., supra,* 207 *N.J.* at 111–12, 23 *A.*3d 352.

 In addition, when an allegation is substantiated, the Division enters "the name of the person found to have committed child abuse and any identifying information" into a Central Registry. *N.J. Div. of Youth & Family Servs. v. M.R.,* 314 *N.J.Super.* 390, 398, 715 *A.*2d 308 (App.Div.1998); *see also N.J.S.A.* 9:6–8.11. Although those records are kept confidential, *see N.J.S.A.* 9:6–8.10a(a), they may be disclosed, on written request, to doctors, courts, child welfare agencies, employers who are required by law "to consider child abuse or neglect information when conducting a background check or employment-related screening," and others, *see N.J.S.A.* 9:6–8.10a(b)(1)–(23).

### V.

### A.

We now consider the proofs presented at the fact-finding hearing in light of the above standards.

To begin with, we note that the Division properly brought this action after A.D.'s birth. It alleged that the newborn was abused and neglected and did not assert harm to a fetus.

The Division admittedly presented no evidence of actual harm to A.D. and does not challenge the trial court's finding that there were no "ill effects" to the child. Hospital records revealed that the newborn's physical exam was normal, and that readings the next day and again at discharge were likewise normal. In addition, a sample of A.D.'s urine taken soon after he was born tested negative for cocaine. Consistent with those findings, the hospital discharged A.D. when he was two days old.

The Division instead argues that A.L. abused and neglected A.D. because of the "substantial risk of harm" the child faced as a result of his mother's prenatal drug use. To meet its burden of showing imminent danger and substantial risk of harm at the fact-finding hearing, the Division presented four documents that related to A.L. and the child but offered no testimony to explain them.

The documents contain two critical pieces of evidence. First, they reveal that A.L. tested positive for cocaine upon admission to the hospital. Although A.L. explained to DYFS that she had been exposed to cocaine two days earlier but had not ingested it, the trial court found her explanation preposterous. The records also reveal that A.L. tested positive for marijuana during a hospital visit in her fifth month of pregnancy.

Second, a stool toxicology report identifies "the presence of the following cocaine metabolite(s)" in A.D.'s meconium: "Benzoylecgonine = 88 ng/g." That statement is not explained anywhere in the trial record.[4] Neither the hospital records nor any other document explains what benzoylecgonine is or discloses the meaning of the level reported in this case. On its own, the one entry does not tell us whether the mother is an addict or used an illegal substance on a single occasion. The notation does not reveal the severity or extent of the mother's substance abuse or, most important in light of the statute, the degree of future harm posed to the child. In other words, a report noting the presence of cocaine metabolites in meconium, without more, does not estab-

---

[4] In the briefs filed with this Court, counsel offer definitions for certain terms. The Division refers to "meconium" as a newborn's first stool. According to A.L., "meconium," although passed after birth, is fetal stool. (Citing *In re Valerie D.*, 223 *Conn.* 492, 613 A.2d 748, 756 n. 13 (1992) ("Meconium is the stool of an unborn child.")). A.L. also represents that the presence of cocaine metabolites in meconium does not mean the presence of active cocaine. Similarly, amici Experts and Advocates represent that "metabolites are what is left once the drug itself has been broken down or inactivated by enzymes in the body, and may indicate that drugs were used in the past, but not recently." The terms were not explored at the fact-finding hearing.

lish proof of imminent danger or substantial risk of harm. *See* *N.J.S.A.* 9:6–8.21(c)(4)(b).

Judges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm. Instead, the fact-sensitive nature of abuse and neglect cases, *see* *P.W.R., supra,* 205 *N.J.* at 33, 11 *A.*3d 844 turns on particularized evidence.

When, as here, the evidence presented does not demonstrate actual or imminent harm, expert testimony may be helpful. Competent expert testimony, stipulations, or other evidence could shed light on the facts introduced. *See N.J.R.E.* 702; *V.T., supra,* 423 *N.J.Super.* at 331, 32 *A.*3d 578; *see also Black v. Seabrook Assocs., Ltd.,* 298 *N.J.Super.* 630, 637, 690 *A.*2d 142 (App.Div.) (expressing "no doubt" that, at retrial in wrongful death action, expert testimony would be required to explain significance of presence of cocaine metabolites in decedent's urine), *certif. denied,* 149 *N.J.* 409, 694 *A.*2d 194 (1997).

Expert testimony must satisfy the traditional standards for reliability. Courts can accept scientific theories as reliable when they are based on a sound methodology that involves "data and information of the type reasonably relied on by experts in the scientific field." *State v. Moore,* 188 *N.J.* 182, 206, 902 *A.*2d 1212 (2006) (quoting *Rubanick v. Witco Chem. Corp.,* 125 *N.J.* 421, 449, 593 *A.*2d 733 (1991)). Courts also "look for general acceptance of scientific evidence within the relevant scientific community." *State v. Henderson,* 208 *N.J.* 208, 248, 27 *A.*3d 872 (2011) (citing *State v. Chun,* 194 *N.J.* 54, 91, 943 *A.*2d 114 (2008)).

In this case, amici Experts and Advocates challenge the Division's position that a mother's use of cocaine poses an imminent risk of harm to a newborn. For support, the Division relies on New Jersey and federal laws that criminalize drug possession, federal child welfare legislation, and "the great weight of medical evidence," among other sources.

Amici Experts and Advocates, for their part, cite dozens of published academic studies and reports in their comprehensive submission. Based on that and other information, Amici contend that there is broad consensus within the scientific community that prenatal drug exposure, on its own, does not establish harm or a substantial risk of harm after birth. They also submit that in individual cases, drug use cannot be singled out from other behavior that poses potential risks to a fetus or a child.

None of those arguments were presented or tested at the trial level. In light of the resolution of this case, they need not—and cannot—be resolved here.

To be clear, we do not require expert testimony in abuse and neglect actions. In many cases, an adequate presentation of actual harm or imminent danger can be made without the use of experts. On the record before us, though, that requirement has not been met.

## B.

There is no doubt that the presence of cocaine metabolites in the meconium of a newborn child should trigger a report to the Division and prompt an investigation. Title 9 requires "[a]ny person having reasonable cause to believe" that a child has been abused to report that information immediately to the Division. *N.J.S.A.* 9:6–8.10. Anyone who knowingly violates that requirement is a disorderly person. *N.J.S.A.* 9:6–8.14.

In response to a report of abuse, the Division's obligation is clear: it "shall immediately take such action as shall be necessary to insure the safety of the child." *N.J.S.A.* 9:6–8.11. The Division must begin an investigation within twenty-four hours, unless a delay is authorized based on a request from a law enforcement official. *Ibid.*

Depending on the proofs the Division uncovers, there may be enough evidence to sustain an abuse and neglect complaint. Here, however, the record does not contain the required level of proof.

Because the evidence presented did not establish actual harm or imminent danger to A.D., the finding of abuse and neglect against A.L. under Title 9 cannot be sustained.[5]

## VI.

Under New Jersey's child welfare laws, the Division has other ways to intervene in a timely fashion in cases like this. The Legislature provided two alternative approaches in Title 30 to address the troubling problem of drug use during pregnancy when there is insufficient proof of actual harm or imminent danger to a child. *N.J.S.A.* 30:4C–11 and *N.J.S.A.* 30:4C–12 outline those options.

## A.

The Division can offer services and provide care or custody under *N.J.S.A.* 30:4C–11 (section 11) in certain circumstances. In response to an application by a parent or relative of a child, or a person or entity with "a special interest in the child," the Division is required to investigate, among other things, whether "it shall appear ... that the safety or welfare of the child will be endangered unless proper care or custody is provided." *N.J.S.A.* 30:4C–11. If the Division reaches that conclusion, it "may accept and provide care or custody as the circumstances of the child may require." *Ibid.* The initial application should set forth facts that show why it appears the child's safety or welfare will be endangered. *Ibid.*

■■■ As in Title 9, the statute focuses on the safety and welfare of children. But section 11 differs from the abuse and neglect law in Title 9 in a number of important ways. First, section 11 applies to an unborn child. The law expressly states that "this section shall be deemed to include an application on behalf of an unborn

---

[5] That conclusion does not disturb the finding of abuse and neglect entered against A.L. in March 2010. *See supra* note 2. As a result, A.L. remains subject to the adverse consequences of a Title 9 finding.

child when the prospective mother is within this State at the time of application for services." *Ibid.*

■ Second, section 11 applies "whenever it shall *appear*" that a child's safety or welfare will be endangered without proper care. *N.J.S.A.* 30:4C–11 (emphasis added). Section 11 therefore imposes a lower threshold of proof than Title 9 because it is not necessary to show actual harm or imminent danger.

■ Third, section 11 contains an important limitation: a pregnant woman or mother must consent to the Division providing services. The statute does not provide authority to compel a parent to accept services.

Section 11 dates back to 1951. *See L.* 1951, *c.* 138, § 11. As part of the same law under which it was enacted, the Legislature declared that

[n]othing in this act shall authorize the State Board of Child Welfare to accept the care or custody of any child, nor to provide welfare services for any child, *except with the voluntary approval and consent of the parent,* parents, legal custodian, guardian or other person with whom the child may be living.

[*L.* 1951, *c.* 138, § 5 (emphasis added) (codified as *N.J.S.A.* 30:4C–5); *see also L.* 1962, *c.* 197, § 11 (modifying parts of law but still requiring voluntary approval and consent).]

In other words, from the time of its enactment, section 11 required the consent of the mother. Although the language quoted above was repealed in 2004, as modified, *see L.* 2004, *c.* 130, § 126 (repealing *N.J.S.A.* 30:4C–5), the Legislature made no change to section 11. In particular, it did not provide a mechanism for the Division to enforce section 11 against a recalcitrant mother.

Thus, at no time has the Legislature granted the Division or the trial court the authority to compel a parent or other guardian to accept services under section 11. *Cf. In re Guardianship of J.C.,* 129 *N.J.* 1, 7, 608 *A.*2d 1312 (1992) (discussing section 11 in context of voluntary placement). In the words of the current statute, DYFS "may *accept* and provide care or custody as the circumstances of the child may require." *N.J.S.A.* 30:4C–11 (emphasis

added). But it may not force a pregnant mother to undergo treatment under section 11.

If an expectant mother applies for assistance, or consents to the Division's involvement after another interested party has applied, the Division can intervene and offer relevant services. If the mother has a substance abuse problem, the Division can refer her to a program for treatment and recovery, among other services, consistent with section 11. *N.J.A.C.* 10:133E–2.3(b)(21).

In this case, the hospital appropriately contacted the Division about the mother's positive test for cocaine. Hospitals fall within the statute's expansive language as to who may submit an application. *See N.J.S.A.* 30:4C–11 ("a person or association or agency . . . having a special interest in the child"). In addition, a hospital referral—even if not in the form of an "application"—is sufficient to trigger section 11. We do not believe that the Legislature meant to limit the Division's use of section 11, and the remedies it affords expectant mothers, simply because information about a child's safety was conveyed in a referral or report rather than a more formal application.

A hospital referral that contains proof an expectant mother ingested cocaine could therefore lead the Division to find that it appears a child's safety is endangered. *See N.J.S.A.* 30:4C–11. And section 11, by its own terms, could thus apply to a woman who ingested cocaine at any time during the course of a pregnancy.

### B.

Alternatively, the Division may seek to provide services or place a child under its care and supervision under *N.J.S.A.* 30:4C–12 (section 12), as it commonly does. As set forth below, section 12 does not apply to unborn children. It also does not require a mother's consent; the statute expressly empowers the Division to obtain a court order to require a mother to accept services.

Section 12 is similar to section 11 in a number of respects. Section 12 is triggered by an oral or written complaint filed with the Division "whenever it shall appear" that a parent or guardian "shall fail to ensure the health and safety of the child, or is endangering the welfare of such child." *N.J.S.A.* 30:4C–12. "[A]ny person or . . . any public or private agency or institution interested" in a child can file a complaint. *Ibid.* On receipt of such a complaint, the Division "shall investigate" it. *Ibid.*

If a parent or guardian refuses to cooperate with or impedes an investigation, the Division can apply for a court order directing the individual "to permit immediate investigation." *Ibid.* After the investigation has been completed, if

it appears that the child requires care and supervision by the division or other action to ensure the health and safety of the child, the division may apply to the Family Part . . for an order making the child a ward of the court and placing the child under the care and supervision or custody of the division.

[*Ibid.*]

At a summary hearing, if "the best interests of the child so require," the court may issue an order that has "the same force and effect as the acceptance of a child for care by the division" under section 11. *Ibid.* Such an order is effective for no more than six months unless the court, on notice to the parents, extends the period of time at a summary hearing. *Ibid.*

Thus, section 12, like section 11, is triggered by the appearance that a child's welfare is endangered. Except for the fact that section 12 does not apply to an unborn child, it empowers the Division with the same range of authority as section 11 but provides a court-ordered mechanism for enforcement. Also, the court's determination is based on the best-interests-of-the-child standard, not the specific language in the abuse and neglect law. *Compare N.J.S.A.* 30:4C–12, *with N.J.S.A.* 9:6–8.21(c)(4). *See also N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 292–93, 914 *A.*2d 1265 (2007).

Section 12 has been described as an additional tool the Division may use when a child or family is "in need of services" or "assistance." *See N.J. Div. of Youth & Family Servs. v. J.C.*, 423

*N.J.Super.* 259, 267–68, 32 *A.*3d 211 (App.Div.2011). Under section 12, a court could order a parent to undergo treatment for substance abuse, similar to treatments available under section 11. *N.J.A.C.* 10:133E–2.3(b)(21); *see also T.S., supra,* 426 *N.J.Super.* at 63–66, 42 *A.*3d 942.

In this case, the Division initially filed claims against A.L. under both the abuse and neglect statute, *N.J.S.A.* 9:6–8.21, and *N.J.S.A.* 30:4C–12. Thus, the Division properly treated the hospital's referral as a basis to investigate under section 12. *See supra* section VI.A. The Division did not ask for a finding under section 12, and the trial court did not enter an order under that statute. (As noted earlier, T.D., the child's father, stipulated that he was part of a family in need of services under section 12.)

## VII.

It is, of course, against the law for anyone to use cocaine, and we do not condone its use in any way. But this is not a criminal case. This appeal is also not about the morality of A.L.'s behavior while pregnant. It is about the meaning of the specific language in the abuse and neglect statute.

The Legislature has carefully crafted several laws to address the problem of drug use by the mother of a newborn and to provide needed treatment and assistance. The statutes have different requirements, and they differ in their scope and application. We rely on the Division's expertise to select the appropriate course of action based on the unique circumstances of each case.

The record before us does not sustain a finding of abuse and neglect in light of the exacting standards of *N.J.S.A.* 9:6–8.21(c)(4)(b). A comparable set of facts in a future case could well justify relief under *N.J.S.A.* 30:4C–11 or –12.

For the reasons set forth above, we are required to reverse the judgment of the Appellate Division.

*For reversal*—Chief Justice RABNER and Justices LAVECCHIA, ALBIN, HOENS and PATTERSON—5.

*Opposed*—None.