# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1484-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.L.,

     Defendant,

and

M.D.,

     Defendant-Appellant,

_____

IN THE MATTER OF J.L.,
a minor.

_____

     Submitted March 10, 2021 – Decided April 13, 2021

     Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FN-21-0188-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Christine Olexa Saignor, Designated Counsel, on the briefs.)

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Lea C. Deguilo, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.D.[1] appeals from a July 10, 2019 Family Part child protection multipurpose order that: (1) awarded joint legal custody of J.L. to M.D. and defendant D.L.; (2) awarded physical custody of J.L. to D.L. during the pendency of the action; (3) awarded supervised visitation to M.D.; and (4) imposed certain requirements on M.D.  He also appeals from an October 25, 2019 order that:  (1) terminated the Title 30 litigation; (2) continued physical

---

[1]  We refer to the parties and minor child by initials to preserve their confidentiality.  R. 1:38-3(d)(12).

custody of J.L. with D.L., with oversight by Maryland Child Welfare Services; (3) continued supervised parenting time by M.D.; and (4) awarded M.D. liberal and unsupervised telephonic contact with J.L. For the following reasons, we affirm.

I.

We derive the following facts from the record. This family became known to the New Jersey Division of Child Protection and Permanency (the Division) in 2009. Since then, the Division has received eleven Child Protective Service referrals, which "involved allegations of substance abuse, alcohol abuse, sexual abuse, inadequate supervision, domestic violence, mental health concerns, and neglect." After investigation, the Division determined that seven of the eleven referrals were unfounded, two were not established, and one was established. The latest referral is the subject of this appeal.

J.L., who was born on October 6, 2012, is the son of M.D. and D.L. In October 2013, as part of a non-divorce application for custody, genetic testing revealed that M.D. was J.L.'s father. In November 2013, following mediation, M.D. and D.L. reached a custody and parenting time agreement under which D.L. would have physical custody of J.L. and M.D. would have alternate weekend parenting time.

A-1484-19

A September 16, 2014 consent order awarded joint legal custody of J.L. to M.D., D.L., and E.L., J.L.'s maternal grandmother. Thereafter, J.L. was placed in the sole physical custody of E.L. because both M.D. and D.L. were unable to care for J.L. at the time. Although J.L. resided with his grandmother, M.D. continued to have alternate week parenting time, and J.L. exercised liberal parenting time.

In January 2015, M.D. sought physical custody of J.L. The court denied his application, determining it was non-emergent. On April 7, 2015, with D.L.'s consent, the court entered an order awarding M.D. physical custody of J.L. and joint legal custody of J.L. to both parents.

On May 27, 2016, M.D. was arrested for making terroristic threats to shoot store employees after attempting to cash a money order. On June 7, 2016, a neighbor reported that J.L., then three-years of age, was outside of the house alone. When the police responded, they found J.L. standing in the road wearing a soiled diaper and M.D. highly intoxicated inside his home. Upon entering M.D.'s home, a police officer observed dirty diapers in the living room and live maggots on a bottle of baby lotion and inside a jar of peanuts in the kitchen. After instructing M.D. to find a relative to care for J.L., police located M.D.'s mother to care for J.L. for the night. M.D. was arrested for child endangerment.

A-1484-19

The following day, the Division received a referral regarding the incident and opened a case. M.D. attended a substance-abuse evaluation and agreed to attend outpatient treatment to address his mental health disorders and substance abuse. On June 30, 2017, the Division closed the case after determining J.L. was no longer at risk.

On February 19, 2019, police responded to M.D.'s home for a welfare check after M.D. posted violent and suicidal statements on Facebook. When the officer approached M.D., he started crying and police detected a strong odor of alcohol. M.D. informed the police that he had taken three pills of Depakote, which M.D. had been prescribed. M.D. was transported to the hospital for a mental health evaluation. M.D. tested positive for marijuana and alcohol.

On February 25, 2019, the Division received a referral concerning M.D.'s statements about committing suicide with a knife while J.L. was in the home under M.D.'s care. The Division initiated an investigation the same day, and M.D. acknowledged that he made suicidal statements on social media. M.D. was unaware J.L. saw him hold a knife to his own throat.

During the Division's assessment, M.D. revealed that he was diagnosed with bipolar disorder, depression, and attention deficit hyperactivity disorder. He further informed the Division caseworker that he recently began individual

5

therapy at Kwenyan and Associates and was registered at Easter Seals. In response, the Division developed a plan for M.D. to continue addressing his mental-health needs through individual counseling and Easter Seals. Ultimately, the Division determined J.L. was safe at the time of the assessment but expressed concerns that needed to be addressed to keep J.L. safe while under M.D.'s care.

On March 19, 2019, the Division initiated an action under Title 30[2] for care and supervision of J.L. (the Title 30 case or litigation) after receiving a referral that J.L. saw M.D. attempt suicide. The Division's investigation revealed that M.D had been struggling with untreated mental health disorders and substance abuse and that M.D. had prior incidents of consuming alcohol while taking his psychotropic medications. Although the Division attempted to assist M.D. after its February visit, he refused to cooperate or accept services.

On March 27, 2019, the court granted the Division care and supervision of J.L. because it was necessary to "stabilize the father and son so they [could] continue to live together." However, J.L. remained in M.D.'s physical custody.

---

[2] Although the Division sought care and supervision of J.L. under Title 30, the case was assigned an FN docket number. References in the record and this opinion to the FN case refer to the Title 30 action.

During the hearing, the court found that M.D., who was struggling with substance abuse and mental health issues, was the sole caretaker for J.L., a special-needs child diagnosed with autism. M.D. had failed to take his prescribed psychotropic medications, and J.L.'s school expressed concerns about J.L.'s behavior. The court ordered M.D. to attend individual therapy and psychiatric care, submit to urine screenings, and comply with the Easter Seals program. The court further ordered that J.L. attend a special-needs assessment, psychiatric evaluation, and play therapy. The Division provided no notice to D.L. because it was unable to locate her.

On April 10, 2019, the court held a hearing on the return date of an order to show cause. M.D. was represented by counsel and appeared for the hearing via telephone, but D.L. did not appear because she still had not been located by the Division. The court continued physical custody of J.L. with M.D. and granted the Division continued care and supervision of J.L. It ordered M.D. to undergo psychiatric and substance-abuse evaluations, submit to at least two drug screens per month, comply with the Easter Seals program, ensure J.L.'s attendance at school, and to advise the Division of D.L.'s whereabouts or her contact information. The court also ordered J.L. to undergo a psychiatric

A-1484-19

evaluation and participate in individual and play therapy through Kwenyan and Associates.

On June 27, 2019, the Division reported that M.D. failed to maintain consistent contact with mental health service providers and continued to test positive for marijuana but negative for his prescribed medications. As a result of his claimed inability to attend his scheduled appointments, M.D. had received inconsistent mental health treatment. The report further revealed that on June 18, 2019, M.D. was arrested because he ran after a vehicle with a machete and threw a bottle at the vehicle. M.D. was charged with aggravated assault with a deadly weapon, bias crime with purpose to intimidate, disorderly conduct, and threatening violence. While M.D. remained in custody, M.D.'s mother and a family friend took care of J.L.

The Division further reported that M.D. knew of D.L.'s whereabouts and her contact information but had failed to inform the Division. On June 24, 2019, D.L. unexpectedly arrived at the Division's office after learning of M.D.'s recent arrest for aggravated assault. She informed the Division that she spoke to M.D. frequently and that he was "aware of her telephone number and whereabouts all along." D.L. showed evidence of their communications to a Division worker. She had been unaware of the Division's involvement with J.L. and traveled to

New Jersey to take him back to Maryland where she lived with her two other children and her mother. On the same day, the Division served D.L. with a verified complaint for care and supervision.

On June 25, 2019, D.L. filed an emergent application for physical custody of J.L. The court denied DL.'s application for lack of emergency but directed her to file a proper application under the Non-Dissolution (FD) docket. That same day, M.D. was released from jail. The Division instituted a safety protection plan whereby M.D.'s parenting time would be supervised.

On July 10, 2019, the court held a Title 30 summary hearing and also heard D.L.'s FD application for physical custody of J.L. Both M.D. and D.L. appeared and were represented by counsel. During the hearing, the court admitted the June 27, 2019 Division report into evidence but excluded police reports with embedded hearsay.

First, the court addressed the issue of physical custody. M.D. objected to transferring custody of J.L. to D.L. and argued that he was back on his psychotropic medications and attending counseling. D.L. represented that she was prepared to take custody of J.L., that she was ready to put services in place for her son, and that she had contacted social services in Maryland. D.L. informed the court that she would permit M.D. to communicate with J.L. and

that her mother and M.D.'s mother could supervise his contact with J.L. The Division supported D.L.'s custody application and reported that Maryland Social Services checked D.L.'s home and found no concerns.

The court awarded physical custody of J.L. to D.L. and continued the Title 30 case because M.D. still needed services to address his mental health and substance abuse issues. The court explained that M.D.'s mental health issues were "of paramount concern" as he had "expressed suicidal ideations and made posts on . . . social media" depicting himself with a knife on his throat and saying "he was going to kill himself." In addition, the court described M.D.'s lack of candor with the court, noting he had failed to disclose D.L.'s whereabouts, falsely reported that he did not know where she was, and said she had basically abandoned J.L. The court found M.D.'s actions revealed he was "only looking out for himself, his own interests, not the interests of his six-year-old autistic son." The court expressed concern about M.D.'s "mental stability, lack of candor to the [c]ourt," and "his ability to take care of [J.L.] on his own."

The court made the following additional findings:

> [M.D.] made suicidal posts on social media. He was also found to be in possession of marijuana and his blood alcohol content was .253 at one point, and [M.D.] was not taking his psychotropic medications as prescribed. I'm not quite sure what he was doing with his psychotropic medications because he kept telling

10

. . . the doctor, "I need more medication, I need more medication," but he didn't test positive for any of his medication and he clearly wasn't taking his psychotropic medications. So that is a concern to this [c]ourt.

[J.L.] is a child who has autism and ADHD. He is only six years old.

[M.D.], again, has been inconsistent with his . . . mental health regimen and therapy, not taking his psychotropic medications, and, most recently, on June 18th, 2019, he was arrested and charged with aggravated assault with a deadly weapon, bias crime[] with purpose to intimidate, and disorderly conduct.

    . . . .

Apparently, he was in the middle of the street. He was wearing all black. Somebody honked at him because he was in the middle of the street. He turned around. They exchanged words between [M.D.] and the driver. Perhaps there were some threats made. [M.D.] then escalated . . . the conflict by going into his house, grabbing . . . a machete, and wielding it at the driver. The police were called and rather than de-escalating, he took a glass bottle and threw it at the vehicle.

    . . . .

This pattern, however, of criminal conduct, lack of control and his mental health is of grave concern to me as he is unable to take care of himself and his impulsivity indicates that he is clearly not in a stable mental state.

A-1484-19

The court explained that the Division investigated D.L.'s ability to care for J.L. through social services in Maryland and determined that she was prepared to take care of J.L. The court noted that D.L. had an ongoing relationship with J.L. despite M.D.'s misrepresentations to the court that she abandoned her son. D.L. drove from Maryland to New Jersey and filed an emergency application for custody as soon as she found out about the open Title 30 case. The court explained that it initially denied her application because there was no emergency but indicated that she could file a proper application for custody, which she ultimately did under an FD docket.

After considering the facts, including the April 2015 joint custody order, the fact that D.L. lived in Maryland with her two other children, and that she was willing and able to take care of J.L., the court granted D.L. temporary physical custody because it was in J.L.'s "best interest." The court found that M.D. was "unable to take care of himself, let alone a six-year-old autistic child." Under the FN docket, the court entered a July 10, 2019 order detailing that J.L. would "continue under the care and supervision of the Division" but D.L. would retain physical custody of J.L.

The court then addressed the services portion of the Title 30 matter, explaining that M.D.'s drug screenings revealed the use of marijuana and that he

12

had not been taking his prescribed medications. The court found that particularly concerning since M.D. had been prescribed various medications. The court further noted that M.D. was inconsistent with counseling and declined services through Easter Seals. The court found that he refused to comply with court orders and failed to take care of himself. The court ordered M.D. to maintain stable housing and submit to random drugs screens, as well as psychological, substance abuse, and psychiatric evaluations. The order awarded supervised parenting time because of M.D.'s untreated mental-health and substance-abuse issues.

In response to objections raised by M.D.'s counsel, the court explained that it relied upon N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 514 (App. Div. 2018), which held that an FD application and FN case may be heard together because of their intertwined nature. The court stated it had "considered all the evidence under both cases to make its determination."

The court concluded the hearing by continuing the Title 30 litigation because it was clear that M.D. still needed services to address his mental health and substance abuse issues. Accordingly, the court entered an order stating that it determined, by a preponderance of evidence, that J.L. required care and supervision by the Division and that M.D. and D.L. were unable to adequately

care for the child.  The court determined that continued services under Title 30 were needed to address M.D.'s mental health and substance abuse to ensure J.L.'s health and safety.

On September 25, 2019, the Title 30 case returned to court for compliance review.  M.D. failed to appear even though he was represented by counsel.  D.L. appeared telephonically and was represented by counsel.  A September 12, 2019 Division report was admitted into evidence.

The Division requested dismissal of the Title 30 litigation because J.L. relocated to Maryland to live with his mother at his grandmother's house and had been receiving assistance from Maryland Child Protective Services.  The Division noted that D.L.'s mother had been very attentive to J.L.'s needs.  D.L. supported the Division's request to terminate the Title 30 litigation, arguing that M.D.'s failure to appear indicated that he was not interested in regaining custody of J.L.  M.D.'s attorney asked the court to keep the Title 30 case open to afford M.D. additional time for rehabilitation and to preserve his right to a best-interest hearing.

The court denied the Division's application to terminate the Title 30 litigation and explained that the case would remain open for a short period to provide M.D. with the opportunity to re-engage in services and to request the

A-1484-19

transfer of custody. Consistent with its rulings, the court entered a September 25, 2019 order allowing J.L. to "continue under the care and supervision of the Division" and remain in D.L.'s physical custody.

On October 15, 2019, the court held a plenary best-interests hearing and case management conference. Only M.D. testified at the hearing. The Division again sought dismissal of the Title 30 litigation. The court admitted the Division's October 11, 2019 report into evidence after excluding certain imbedded hearsay statements.

The Division explained that J.L. continued living with his maternal grandmother in Maryland and Maryland Child Protective Services continued assisting him. J.L. was enrolled in school and was covered by medical insurance. The Division asserted that M.D. failed to maintain consistent contact with the Division and failed to attend his first appointment at Freedom House. Although he attempted to re-engage with Easter Seals, his caseworker informed the Division that his participation and communication were minimal.

M.D. did not request that custody be immediately returned to him. His counsel explained that M.D. "had been engaged in therapeutic services" but "obviously" could not yet make that request.

A-1484-19

The court noted the Title 30 case "had been open for 210 days" and that M.D. had "not engaged in the services recommended." The court explained that M.D. completed psychological, psychiatric, and substance abuse evaluations but had failed to follow through with subsequent treatment.

The court issued an October 28, 2019 written decision denying M.D. physical custody of the of J.L. and terminating the Title 30 litigation. It determined that despite D.L.'s unstable housing, it was in J.L.'s best interests to remain in his mother's physical custody where he received assistance from both his maternal grandmother and Maryland Child Welfare Services. M.D. and D.L. continued to share joint legal custody of J.L. in the companion FD action.

The judge found M.D.'s testimony not credible. She observed that M.D. "made poor eye contact throughout his testimony, especially when asked about compliance with medical appointments and administration of psychotropic medications for himself and [J.L.] He looked down at his hands and let his voice trail off, giving the impression that not even [he] believed his own words." The judge noted that M.D. "skated around critical questions regarding compliance with court orders." For example, when questioned "about his attendance at counseling appointments between March 2019 and July 2019, [M.D.] testified he and [J.L.] attended 'as often as allowed.' [M.D.] blamed transportation as a

16

barrier to attendance, even though he acknowledged Kwenyan and Associates provided free transportation."

The judge also found M.D.'s negative remarks about Easter Seals untrustworthy since his testimony was directly contradicted by a report from Easter Seals, which revealed that M.D.'s participation and communication were minimal. Similarly, the judge found M.D.'s description of D.L. as a drug addict with a poor work history, to be highly suspect. The judge also concluded that M.D.'s claim that D.L. abandoned J.L. when he was nine months old was belied by previous custody orders.

Lastly, the court noted that M.D.'s "memory was faulty and he was not able to remember accurately important dates," including events that occurred just a few days before the hearing. The court concluded that M.D.'s "lack of eye contact, evasion of straightforward questions, and inaccurate recollection of recent events" revealed that he "was not a reliable historian."

"Based on the evidence adduced at the plenary hearing," the judge concluded it was in J.L.'s best interests to remain in D.L.'s physical custody, "with oversight by Maryland Child Welfare Services." The judge reasoned:

> The court considered the credible testimony adduced at trial and finds that [M.D.] has not demonstrated changed circumstances to warrant a return of physical custody. A few days before the best interests hearing

[M.D.] re-engaged in substance abuse treatment at Freedom House. He has yet to show consistent attendance and commitment to sobriety. [M.D.] has not re-engaged with Kwenyan and Associates for individual therapy. And regarding medication monitoring, he attended a psychiatric appointment the day before the best interests hearing and received prescriptions for psychotropic medications, which prescriptions he has yet to fill. . . . [M.D.] has not scratched the surface to address and ameliorate the concerns that led to the commencement of the [Title 30] litigation. By his own admission, [M.D.] remains addicted to illicit substances, and he has not engaged in individual counseling or psychotropic medication management to address his mental health disorder.

Because of [M.D's] failure to prove changed circumstances, his application to return [J.L.] to his physical custody is denied. It is not necessary to engage in a best interests analysis under N.J.S.A 9:2-4; however, [D.L.] wishes to remain in Maryland with [J.L.] and the Division seeks to terminate the [Title 30] litigation in New Jersey. Because the court transferred custody of [J.L.] to [D.L.] in Maryland, the court is constrained to engage in a best interests analysis under Bisbing v. Bisbing, 230 N.J. 309 (2017) before closing this case.

The judge then considered the factors enumerated in N.J.S.A. 9:2-4.[3] The court

found that only factor eight favored custody with M.D., whereas factors three,

---

[3] N.J.S.A. 9:2-4 enumerates the following factors to be consider by the trial court in making an award of custody:

seven, and ten favored D.L. The judge found that factors one, two, and twelve were in equipoise, and factors four, five, six, nine, eleven, thirteen, and fourteen were inapplicable.

The court found factor three weighed in favor of D.L. because granting her custody would reunite J.L. with his half-siblings. The court noted, however, that J.L. has a strong relationship with both parents.

---

the parents' ability to agree, communicate and cooperate in matters relating to the child [(factor one)]; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse [(factor two)]; the interaction and relationship of the child with its parents and siblings [(factor three)]; the history of domestic violence, if any [(factor four)]; the safety of the child and the safety of either parent from physical abuse by the other parent [(factor five)]; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision [(factor six)]; the needs of the child [(factor seven)]; the stability of the home environment offered [(factor eight)]; the quality and continuity of the child's education [(factor nine)]; the fitness of the parents [(factor ten)]; the geographical proximity of the parents' homes [(factor eleven)]; the extent and quality of the time spent with the child prior to or subsequent to the separation [(factor twelve)]; the parents' employment responsibilities [(factor thirteen)]; and the age and number of the children [(factor fourteen)]. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

A-1484-19

The court found factor seven weighed in favor of D.L. because there were no concerns with medical care for J.L. in Maryland. Given J.L.'s autism and behavioral needs, the Division became concerned about M.D.'s ability to care for him and to regularly attend his medical appointments. In contrast, after J.L. relocated to Maryland, he was enrolled in school, obtained medical insurance coverage, and began receiving services through Maryland Child Welfare Services.

The judge found that factor ten weighed heavily in D.L.'s favor because M.D. "has demonstrated that he is unable to care for himself." She court found M.D. "ha[d] not been attending mental health appointments with regularity" and that "he ha[d] not filled the prescriptions necessary to stabilize his mental health." The judge noted that M.D. had only obtained prescribed medications the day before the best interests hearing. She explained that there was "no evidence that" M.D. had been "taking his medications as directed" and emphasized the problematic nature of M.D.'s insistence on continued marijuana use. Moreover, even though M.D. had completed an intake appointment at Freedom House and was recommended for intensive outpatient treatment, he never engaged in that treatment.

The judge factor eight weighed in favor of M.D. Although M.D. represented that he was current with his rent payments, he told the Division that his house was under construction and messy when a caseworker attempted to conduct a home inspection. The judge did not give significant weight to this factor because it was unable to confirm the condition of M.D.'s home. She noted that a recent incident between D.L. and her mother caused D.L. to move out of her mother's house where D.L. had resided with her two other children. Because of D.L.'s housing instability at the time, the judge found factor eight weighed slightly in M.D.'s favor.

The judge found factor one in equipoise because "the parties have been unable to communicate and cooperate about matters relating to [J.L.]." She found M.D.'s representations about D.L. to be false. While M.D. testified that his communications with D.L. were strained, he spoke with J.L. weekly. The judge found that M.D. had failed to inform D.L. about J.L. since he received physical custody in April 2015. It was "only when [M.D.] was incarcerated that [D.L.] was informed about [J.L.'s] status."

As to factor two, the judge found "[b]oth parties appear[ed] equally willing to accept custody of [J.L.]." She explained that D.L. had sole legal custody of J.L. for the first two years of his life and that M.D. had physical

custody of J.L. from April 7, 2015 until July 10, 2019. As soon as D.L. learned of M.D.'s incarceration, she drove to New Jersey and sought physical custody.

The judge found factor twelve in equipoise because both parents spent time with J.L., with D.L. raising him in his early years and M.D. raising him in his later years.

The judge found factor four inapplicable because there was no evidence of any history of domestic violence between the parents. Similarly, she found factor five inapplicable because there was no evidence of physical abuse. The judge found factor six inapplicable because J.L. was "not capable of expressing his preferences." She gave little weight to M.D.'s hearsay testimony that J.L. wished to reside with him.

The judge found factor nine inapplicable because it was unable to properly assess this factor given the lack of credible testimony concerning the quality of the schools attended in New Jersey or Maryland. She also found factor eleven inapplicable despite the distance the parents lived apart because the biological grandmothers were able to arrange visitations and M.D. spoke to J.L. every week. The judge found factor thirteen inapplicable because of the lack of evidence concerning the employment of either parent. She factor fourteen inapplicable because the parties had no other children together.

A-1484-19

The judge noted that D.L.'s unstable housing remained a concern but explained that she arranged for J.L. to reside with her mother, who has been a stable support system throughout his life. While D.L. had not shown she was able to independently care for J.L., the judge concluded that it was in J.L.'s best interests for physical custody to remain with D.L. in Maryland so long as she received assistance from her mother. She advised that the custody factors may need to be reassessed if D.L. removes J.L. from his grandmother's house.

In addition, the judge explained that M.D.'s parenting time would remain supervised by either grandmother because of his untreated mental health disorders and substance abuse. She noted that the parties would arrange parenting time and that telephone communications between M.D. and J.L. would remain liberal and unsupervised.

Lastly, the judge dismissed the Title 30 litigation, determining there were no grounds to keep the case open since J.L. was no longer receiving services through the Division in New Jersey, and M.D. had not availed himself of the services offered by the Division. Consistent with her decision, the judge entered an October 29, 2018 order terminating the Title 30 litigation. This appeal followed.

M.D. raises the following points for our consideration:

I. THE TRIAL COURT'S JULY 10, 2019 DECISION TO TRANSFER CUSTODY TO THE MOTHER, D.L., WAS ERRONEOUS BECAUSE THE FATHER, M.D., WAS ONLY BRIEFLY UNAVAILABLE TO CARE FOR HIS CHILD, THERE IS NO EVIDENCE IN THE RECORD THAT THE CAREGIVER WITH WHOM THE CHILD WAS LEFT DURING M.D.'S UNAVAILABILITY WAS NOT COMPETENT TO PERFORM THAT TASK, AND BECAUSE M.D. HAS NEVER HAD A FINDING OF ABUSE OR NEGLECT ENTERED AGAINST HIM.

II. THE TRIAL COURT'S JULY 10, 2019 DECISION TO TRANSFER CUSTODY TO THE MOTHER, D.L., WAS ERRONEOUS BECAUSE THE TRIAL COURT FAILED TO APPLY THE PROPER LEGAL STANDARD TO ITS DETERMINATION OF D.L.'S APPLICATION FOR TRANSFER OF CUSTODY.

III. THE OCTOBER 15, 2019 BEST INTERESTS HEARING WAS IMPROPERLY PREMATURE AND INCOMPLETE AND THUS DENIED THE FATHER, M.D., HIS DUE PROCESS RIGHTS AS RELATED TO HIS CONSTITUTIONAL RIGHT TO THE CARE AND CUSTODY OF HIS CHILD.

IV. THE TRIAL COURT'S OCTOBER 29, 2019 DECISION TO DENY M.D.'S APPLICATION FOR THE RETURN OF HIS CHILD TO HIS CARE WAS NOT SUPPORTED BY THE EVIDENCE CONTAINED IN THE RECORD BELOW.

V. THE TRIAL COURT'S OCTOBER 29, 2019 DECISION TO PREMATURELY DISMISS THE FN LITIGATION AMOUNTS TO A DENIAL OF DUE PROCESS BECAUSE M.D. WAS NOT AFFORDED A REASONABLE OPPORTUNITY TO ENGAGE IN SERVICES TO WHICH HE IS LEGALLY ENTITLED

24

AND WAS LEFT WITH NO PRACTICABLE LEGAL RECOURSE TO EXERCISE AND ENFORCE HIS LEGAL CUSTODY AND VISITATION RIGHTS.

## II.

We are guided by well-established principles of review. "[W]e accord great deference to discretionary decisions of Family Part judges[,]" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (citing Donnelly v. Donnelly, 405 N.J. Super. 117, 127 (App. Div. 2009)), in recognition of the "family courts' special jurisdiction and expertise in family matters," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). An abuse of discretion occurs "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Milne, 428 N.J. Super. at 197 (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561. 571 (2002)).

A reviewing court will defer to a judge's factual findings determinations when "they are supported by 'adequate, substantial and credible evidence' on the record." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). Additionally, we generally "grant deference to the trial court's credibility

determinations." Ibid. However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

"[T]he opinion of the trial judge in child custody matters is given great weight on appeal." Terry v. Terry, 270 N.J. Super. 105, 118 (App. Div. 1994) (citations omitted). However, the trial judge must consider the statutory criteria enumerated in N.J.S.A. 9:2-4. Id. at 107. In turn, we "must evaluate that opinion by considering the statutory declared public policy and criteria which a [judge] must consider." Id. at 118.

The judge must "reference the pertinent statutory criteria with some specificity and should reference the remaining statutory scheme at least generally, to warrant affirmance." Id. at 119. The judge must also "consider and articulate why its custody decision is deemed to be in the child's best interest." Ibid. "[T]he paramount consideration is the safety, happiness, physical, mental and moral welfare of the child." Ibid. (quoting Fantony v. Fantony, 21 N.J. 525, 536 (1956)). "[T]hat analysis requires the court to consider any and all material evidence." Kinsella v. Kinsella, 150 N.J. 276, 317

(1997) (citing In re Baby M., 109 N.J. 396, 456 (1988)). "The 'best-interest-of-the-child' standard . . . is an expression of the court's special responsibility to safeguard the interests of the child at the center of a custody dispute because the child cannot be presumed to be protected by the adversarial process." Id. at 317-18.

III.

We affirm substantially for the reasons set forth by Judge Haekyoung Suh in her July 10, 2019 oral decision and comprehensive October 29, 2019 written decision. We add the following comments.

In her decision, the judge made comprehensive findings of fact and specific credibility findings. Those findings were amply supported by the record. She also expressed her reasons for finding that keeping the Title 30 case open in order to provide M.D. with additional opportunities to engage in services was not required.

M.D. argues that the judge prematurely terminated the Title 30 case and thereby denied his right to due process because he was not afforded a reasonable opportunity to engage in services. We disagree. The judge scrupulously attended to the parties' rights throughout the entire proceedings and M.D. had the benefit of counsel at all stages of the litigation. Although the judge could

have conducted another dispositional hearing before dismissing the Title 30 case, the Division had repeatedly requested dismissal, the Title 30 case was then nine months old, and M.D. had still not complied with services aimed at addressing his mental health and substance abuse issues.

"Where an order of care and supervision has been entered pursuant to N.J.S.A. 30:4C-12, it is only effective for six months." N.J. Div. of Youth and Fam. Servs. v. T.S., 426 N.J. Super. 54, 66 (App. Div. 2012). "Absent a showing that services or supervision or both appear to be in the best interests of the child because the services are needed to ensure the child's health and safety, a case should be dismissed." Ibid. "[T]he Division and the court must not lose sight . . . that the order expires after six months unless grounds for an extension of the Division's authority to intervene are established as required by N.J.S.A. 30:4C-12." Ibid.

The court has discretion in determining whether to extend the Title 30 litigation if the court is satisfied, by a preponderance of the evidence, that the best interests of the child require extension. N.J. Div. of Youth and Fam. Servs. v. I.S., 214 N.J. 8, 37-38 (2013). "Parents do not have the right to extend litigation indefinitely until they are able to safely care for their children." S.D., 453 N.J. Super. at 524. M.D. completed psychological, psychiatric, and

substance abuse evaluations but had failed to follow through with subsequent treatment. J.L. was no longer receiving services through the Division. Given the extended timeline of this case, J.L.'s residence in Maryland, and M.D.'s proven lack of compliance and progress, the judge did not abuse her considerable discretion in dismissing the Title 30 case. As we explained in T.S., the purpose of further hearing in a care and supervision case "is not to check-up on and review a parent's compliance." 426 N.J. Super. at 66. Here, "continued care and supervision" by the Division was no longer "need[e]d to ensure the child's health and safety." Id. at 66-67.

M.D. further argues that the decision to award J.L. physical custody was not supported by the evidence and that the judge did not apply the correct legal standard when it transferred custody of J.L. to D.L. He contends that he was able to care for J.L. despite struggling with his mental-health and substance-abuse issues, and he characterized his criminal conduct as minor offenses. He notes that there was no finding of abuse and neglect or any evidence presented that indicated J.L. was harmed. We are unpersuaded.

The judge found that three statutory custody factors (factors three, seven, and ten) favored D.L. Only factor eight favored M.D. The other factors were found to be in equipoise or inapplicable. Implicit in the judge's decision is that

A-1484-19

the statutory factors in favor of J.L. outweighed the single factor in favor of M.D. The record fully supports these findings.

In a Title 30 action for care and supervision, the Division may intervene when "a child who, although not abused or neglected, [may be] in need of services to ensure [his or her] health and safety." T.S., 426 N.J. Super. at 64. Under N.J.S.A. 30:4C-12, the Division is authorized to investigate complaints that a person responsible for a child is unable "to ensure the health and safety of the child[] or is endangering the welfare of such child." Ibid. (quoting N.J.S.A. 30:4C-12). "[S]ection 12 . . . is triggered by the appearance that a child's welfare is endangered." N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 33 (2013).

"N.J.S.A. 30:4C-12 provides the means for the Division to effectuate services to children in need when a parent does not consent to the Division's supervision, care, or custody." I.S., 214 N.J. at 33. Its "purpose is to protect children." Ibid. (citing M.M., 189 N.J. at 293). Therefore, "the Division can seek a court order to intervene and require a [parent or guardian] to undergo treatment, or seek other relief, if the best interests of the child so require." A.L., 213 N.J. at 9 (citing N.J.S.A. 30:4C-12). The Division may obtain custody, care, or supervision of a child under N.J.S.A. 30:4C-12 regardless of whether abuse

or neglect is established under Title 9. I.S., 214 N.J. at 33 (citing M.M., 189 N.J. at 292).

"When custody issues become intertwined with child-protection actions, then dispositional questions that lie at the intersection of the two matters become complicated by a parent's delay in achieving circumstances that make it safe for the child to return to the former custodial parent." Id. at 41. However, "a noncustodial parent who obtains full-time care of a child after the initiation of child-protection proceedings 'may always initiate a request for a change in custody,' which involves a changed-circumstances inquiry and, ultimately, becomes a best-interests analysis." Id. at 40 (quoting N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 402 n.3 (2009)). The parent to whom custody was temporarily transferred during the child-protection litigation has the burden of proving placement with them under the best-interests standard. Id. at 40–41. Even if this process is not followed "precisely," placement with the parent to whom custody was temporarily assigned is suitable if returning the child to the parent from whom she was removed "would not have been consistent with the court's continued responsibility to act in the best interests of [J.L.]." Id. at 41.

In addition, "[j]udges who handle FN and FD dockets may choose to handle the matters separately or at the same time." B.C. v. N.J. Div. of Child

31                                                                A-1484-19

Prot. & Permanency, 450 N.J. Super. 197, 206 (App. Div. 2017). "Although it is preferable for the court to ensure that there [are] separate and distinct proceedings at which Title 30 actions are adjudicated to disposition and [FD] custody matters are adjudicated," the "procedure may not always prevail" and a "consolidated procedure" may not necessarily result in any cognizable harm to the child. I.S., 214 N.J. at 41-42. Notably, "[a] court's technical designation of a hearing as FD or FN should not hamper the court's mission to safeguard the welfare of children." S.D., 453 N.J. Super. at 525. "When unusual procedures are undertaken, however, it is crucial to ensure that the parents are represented by counsel." Ibid.

Here, the Division filed the Title 30 complaint after attempting to address concerns that had been raised by the February 25, 2019 referral, which alleged that J.L. witnessed M.D. attempting to commit suicide with a knife. The Division had the authority and duty to intervene to ensure J.L.'s health and safety because Section 12 "is triggered by the appearance that a child's welfare is endangered." A.L., 213 N.J. at 33; T.S., 426 N.J. Super. at 64.

During the pendency of the Title 30 litigation, D.L. applied for physical custody under the FD docket after learning of M.D.'s arrest and the Division's open Title 30 case. During the July 10, 2019 combined hearing, the judge

admitted the June 27, 2019 Division report into evidence, which revealed that M.D. had failed to participate in court ordered services.

The judge expressed great concern regarding M.D.'s "mental stability, lack of candor to the [c]ourt," and "his ability to take care of [J.L.] on his own." M.D. advised Easter Seals that he was no longer interested in receiving services, and Kwenyan and Associates closed M.D.'s case due to his lack of compliance with the program. M.D.'s drug screenings revealed the use of marijuana and that he had not been taking his prescribed medications. She found that M.D. was inconsistent with his mental-health regimen and therapy and failed to take his psychotropic medications. In addition, on June 18, 2019, M.D. was arrested and charged with aggravated assault with a deadly weapon, bias crime, with purpose to intimidate, and disorderly conduct.

The judge stated that M.D.'s pattern "of criminal conduct, lack of control and his mental health is of grave concern to [the court] as he is unable to take care of himself and his impulsivity indicates that he is clearly not in a stable mental state." These findings of fact were fully supported by substantial credible evidence.

We reject M.D.'s contention that the judge applied the wrong legal standard in awarding physical custody to D.L. The judge granted D.L. physical

custody because it was in J.L.'s best interests given M.D.'s unresolved mental-health and substance-abuse issues.  See I.S., 214 N.J. at 40.  Even though the FD and the Title 30 matters were intertwined in one hearing, transferring physical custody to D.L. was suitable considering M.D.'s instability.  Id. at 41. See also S.D., 453 N.J. Super. at 525 (stating that "a court's technical designation of a hearing as FD or FN should not hamper the court's mission to safeguard the welfare of children").

Moreover, M.D. received adequate notice and a fair opportunity to be heard regarding the best interests hearing. Designating the hearing as a combined FD/Title 30 hearing "ensure[d] the participation of defense counsel and the Law Guardian[.]"  S.D., 453 N.J. Super. at 525.  The consolidation of the cases did not deprive M.D. of due process or result in any cognizable harm to J.L.  I.S., 214 N.J. at 41.

M.D.'s remaining arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1484-19