# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1274-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

E.S.,

      Defendant-Appellant,

and

A.B.,

      Defendant.

_____

IN THE MATTER OF
G.S., a minor.

_____

Submitted February 27, 2025 – Decided March 21, 2025

Before Judges Walcott-Henderson and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FN-14-0054-21.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Catherine W. Wilkes, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant E.S.,[1] mother of minor G.S., appeals from a May 20, 2022 Family Part order finding E.S. had abused or neglected G.S., under N.J.S.A. 9:6-8.21(c)(3), and a November 14, 2023 final judgment terminating litigation. Based on this record, we conclude there is substantial credible evidence to support the court's finding and affirm.

---

[1] In accordance with Rule 1:38-3(d)(12) we use initials to protect records relating to Division of Child Protection and Permanency (the Division) proceedings.

I.

We glean the following relevant facts substantially from the fact-finding and kinship legal guardianship (KLG) hearings. The Division became involved with E.S. in February 2020 when it received a child welfare services report stating E.S. had relapsed on heroin while thirty-four weeks pregnant. G.S. was born to E.S. on March 29, 2020, at which time the Division opened a case. G.S.'s biological father is unknown, but was previously purported to be A.B., who is named in the case. E.S. received treatment and continued to engage in support and services, and the Division closed its case in October 2020 because G.S. appeared safe in E.S.'s care.

On April 28, 2021, the Rockaway Borough Police Department responded to an emergency call from E.S. reporting she thought one-year-old G.S. had ingested Subutex, which she had in her purse.[2] E.S. said that she found G.S. next to her unzipped purse and she appeared "drowsy and sweaty and unable to shake her head." The 9-1-1 dispatcher advised E.S. to perform cardiopulmonary resuscitation on G.S., which she did until Emergency Medical Services (EMS) arrived and administered Narcan to G.S. The Narcan reversed G.S.'s symptoms

---

[2] Subutex is "an opioid medication used to treat opioid addiction." Subutex Uses, Dosage, Side Effects & Warnings, https://www.drugs.com/subutex.html (last visited Mar. 11, 2025).

and EMS transported her to Morristown Medical Center where she was tested for various narcotics, including phencyclidine, benzodiazepines, cocaine, amphetamines, cannabinoids, opiates, barbiturates, and methadone. G.S. was not tested for fentanyl. She was hospitalized for one day and then released to E.S.

During the ensuing Division investigation, E.S. admitted to having used crack cocaine approximately two months earlier with a friend in New York and driving with G.S. in the vehicle from New York to New Jersey while under the influence. E.S. allowed the Division worker to observe her arms which the worker noted had multiple open sores and reddened areas in different stages of healing. E.S. agreed to complete a substance abuse evaluation and urine drug screen. The Division's April 2021 investigation summary, written in response to the April 28, 2021 incident, confirmed the allegations of "inadequate supervision" and "risk of harm" to G.S., but found the allegation the "substance abuse of caregiver threatens child" was not established.

On May 3, 2021, the Division received the results of E.S.'s drug screen and confirmed she had tested positive for cocaine and opiates, and negative for Subutex. Based on this information, the Division contacted Detective Robert Koehler who reported that he would contact Morristown Medical Center for

G.S.'s medical records. On the same day, the Division confirmed G.S.'s April 29, 2021 urine screens were negative for cocaine, benzodiazepines, barbiturates, methadone, amphetamines, opiates, cannabis, and Subutex.

The Division interviewed E.S. on May 3, 2021, wherein she admitted to using cocaine approximately two weeks earlier in New York with the person she suspected was G.S.'s father, although she did not know his last name. The Division worker next met with A.S., G.S.'s maternal grandmother, privately. A.S. confirmed E.S. had relapsed in January 2021 but denied knowledge of any other drug use since January leading to G.S.'s hospitalization.

The Division then implemented a safety protection plan with E.S.'s consent, which required A.S. to move into the home and supervise all contact between E.S. and G.S. The court granted the Division care and supervision of G.S.; required E.S. have only supervised contact with G.S.; and ordered E.S. to attend a drug and alcohol evaluation and cooperate with random urine screens. The order also required E.S. stay in contact with the Division on a weekly basis and notify them of any change of address or telephone number.

The following month, the Division was notified that E.S.'s May 21 and May 28 urine screens tested positive for fentanyl. In the ensuing weeks, E.S. tested positive for fentanyl, cocaine, heroin, and her prescribed methadone.

5

According to the Division's records, E.S. also admitted to a relapse and sought help in a walk-in detox facility in June 2021. The Division worker advised E.S. that if she tested positive for fentanyl again, she would be recommended to complete a higher level of care in a short-term inpatient facility. E.S. denied the relapse. She eventually agreed to intensive outpatient treatment in July 2021 and later inpatient treatment at a Mommy and Me program.

At an August 11, 2021 scheduled visit, E.S. disclosed using illicit substances that month to the Division worker. Later that month, the Division received a medical consultation from Audrey Hepburn Children's Home (AHCH) noting G.S.'s symptoms and reversal of her symptoms after Narcan were consistent with an acute opioid ingestion. AHCH recommended E.S. be referred to a drug treatment center and for a psychological evaluation.

At the end of September 2021, it was confirmed E.S. attended Morris County Aftercare Center for methadone but was no longer attending the outpatient program. At this time, E.S.'s urine screens continued to test positive for methadone, fentanyl, and cocaine. On October 1, 2021, the Division filed an amended complaint requesting an order granting the Division custody of G.S. and directing E.S. "to engage in and complete" an inpatient program. The same day, the court ordered: the Division assist E.S. in finding an inpatient program;

6

the Division care, custody, and supervision of G.S., who would remain with A.S.; and E.S. to have only supervised visitation with G.S.

The court held a fact-finding hearing on April 5, 2022. The Division first called Division caseworker Urmene Remy as custodian of the records. During the admittance of evidence, E.S. objected to the April 29, 2021 screening summary as hearsay. The court dismissed the objection stating Rule 5:12-4 permits reports prepared by other Division personnel, under N.J.R.E. 803(c)(6) and 801(d). The court admitted the summary, noting it "is clearly a business record pursuant to [N.J.R.E.] 803(c)(6)" and furthermore, was not offered for the truth of the matter asserted.

E.S. then objected to the portions of the April 29, 2021 investigation summary referencing any interviews with family members, hospital staff, and police, or drug tests. The court ruled the conversations were admissible non-hearsay because they were offered not for the truth of the matter asserted but "for what action [the Division] took based upon those conversation within [the] investigation." Likewise, the court concluded references to the drug tests were admissible for their effect on the Division's subsequent actions. The Division next called caseworker Vanessa Medrano-Cortez who wrote the investigation

summary. She first recounted the family's history with the Division and her process conducting the Division investigation.

The Division presented its expert in pediatrics and child abuse or neglect cases, Pediatric Nurse Practitioner Jennifer Romalin. Romalin recounted her experience and practice treating pediatric patients. She concluded, according to the records, G.S. had displayed signs of opioid ingestion, including pinpoint pupils and decreased respiratory effort and consciousness, but experienced an immediate reversal of those symptoms after she was administered Narcan. Romalin concluded G.S. had ingested an opioid because her immediate response to Narcan was consistent with acute opioid ingestion.

She opined Narcan does not have an effect on individuals who do not have opioids in their systems. She also noted G.S.'s urine screen was negative for Subutex, contrary to E.S.'s statement to police that G.S. had ingested Subutex. Romalin concluded, despite the negative urine screen, G.S. had an acute opioid ingestion for several reasons. First, "opiates in a urine drug screen only tests for morphine and codeine, which are . . . naturally derived from opium." And, "[n]ot every opioid . . . will test positive. [M]aybe it's to be tested separately . . . there are other opioids that exist that would have to be tested separately." For instance, fentanyl is a synthetic opioid that would not show positive on a typical

urine screen and would need to be tested separately. Romalin reiterated, "based on the fact that [G.S.] was administered Narcan, which caused a reversal of her symptoms, she ingested an opioid. Specifically what opioid she ingested[,] I cannot say because she was not tested for every opioid. She was . . . only tested separately for [Subutex]." No other expert testimony was provided.

On May 16, 2022, the court found E.S. abused or neglected G.S. in an oral opinion. Its determinations were based on the "unrefuted and unrebutted Division record, including . . . the credible testimony of witnesses and the evidential exhibits accepted." The court recounted the testimony and concluded E.S. "failed to secure her medication . . . in a safe, reasonable, and responsible manner." The court determined E.S. left her medication accessible to G.S., but found this "single instance" of E.S.'s failure to secure her medication did not rise to the level of wanton or gross negligence.

Nevertheless, E.S. displayed far more reckless, dangerous, and wanton behavior when she smoked crack while caring for G.S. and operating a motor vehicle. The court found "smoking crack while in a caretaking role with your child is wanton and grossly negligent." The court also relied on E.S.'s positive cocaine and opiate urine screens conducted two days after G.S.'s hospitalization and the lack of any Subutex in her system to support its finding E.S. abused or

9

neglected G.S. by a preponderance of the evidence. More than one year later, the court terminated the litigation and awarded KLG to A.S.

At the November 14, 2023 KLG hearing, Division worker Tracey Doyle-Leach testified that in October 2021, G.S. was removed from E.S.'s care. They reunified briefly on June 10, 2022. However, weeks later, G.S. was removed from E.S.'s care when E.S. left the inpatient program following an argument with another resident in violation of the safety protection plan court order. G.S. was placed in a licensed resource home where she remained.

Doyle-Leach testified although E.S. initially complied with Division services and completed some drug treatment programs, she continued to test positive and has not completed treatment. Doyle-Leach further testified that E.S.'s substance abuse continues to present a risk of harm to G.S. and E.S. planned to have A.S. become the caregiver through KLG, which the Division agreed was in the best interest of G.S. Doyle-Leach noted that A.S. had been the G.S.'s caregiver for "over a year, close to two years." At the conclusion of her testimony, the court entered exhibits consisting of Division records, including the KLG assessment, in evidence without objection.

A.S. testified she had been G.S.'s caretaker since October of 2021; she understood the difference between KLG and adoption; agreed to serve as G.S.'s

KLG, including the commitment to care for and support G.S. until she turns eighteen, if necessary; she understood that the KLG means that E.S.'s parental rights remain intact and that E.S. retains the right to visit G.S.; and that E.S.'s visits must be supervised at all times. A.S. also confirmed she understood violation of KLG could result in G.S.'s removal from her care.

At the conclusion of the testimony and admission into evidence of the Division's records, the court made the following findings of fact and conclusions of law. The court found the KLG assessment required under N.J.S.A. 3B:12A-5(b) was marked into evidence and reviewed by the court. The court expressed its agreement with the proposed KLG and stated the underlying purpose behind the statute, which is "to ensure that youngsters have the ability to have a connection with their kin, more and more we . . . hope to employ permanency plans like this and it's really quite a blessing when you have kin . . . who is willing to take on this role of kinship legal guardianship." The court concluded the caregiver established over the last twelve months that she is fully capable and willing to perform these services. E.S. had consented to the application and the court expressed its satisfaction with the Division's diligent efforts to locate the putative father, A.B. The court concluded by finding the proposed plan was in the best interest of G.S. and that all of the requirements of N.J.S.A. 3B:12A-

were met.  The court entered the order granting A.S., KLG over G.S.  This appeal followed.

## II.

"We accord deference to fact findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012).  "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'"  N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).  We owe no deference to a judge's legal conclusions which are reviewed de novo.  N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

In cases such as this, two parallel statutory schemes balance the competing interests of "a parent's constitutionally protected right 'to raise a child and maintain a relationship with that child, without undue interference by the state,' and 'the State's parens patriae responsibility to protect the welfare of children.'" N.J. Div. of Child Prot. & Permanency v. A.L., 213 N.J. 1, 17-18 (2013) (first citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 102 (2008); then

citing In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999)). Title Nine addresses "acts of abuse [or] neglect against a child." Id. at 18. Title Thirty governs guardianship proceedings where the Division "seeks to terminate parental rights." Ibid.

Under Title Nine, an "abused or neglected child" means a child less than eighteen years of age whose parent or guardian:

> (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted loss or impairment of the function of any bodily organ; . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c).]

The Division "bears the burden of proof at a fact-finding hearing and must prove present or future harm to a child by a preponderance of the evidence." A.L., 213 N.J. at 22 (citing N.J.S.A. 9:6-8.46(b)). Prima facie evidence that a child has been abused or neglected includes: "proof of injuries sustained by a

13

child or of the condition of a child of such nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parents or guardian." N.J.S.A. 9:6-8.46(a)(2). Proofs must be evaluated based on the totality of the circumstances "because the evidence can be synergistically related." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 39 (2011). In the absence of actual harm, the Division may demonstrate abuse [or] neglect based on "proof of imminent danger and substantial risk of harm." A.L., 213 N.J. at 23. "A court need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

### III.

E.S. argues the court erred in finding she violated N.J.S.A. 9:6-8.21(c) because providing inadequate supervision of G.S. on April 28, 2021, did not constitute grossly negligent or wanton conduct; her admissions to prior drug use were not sufficient to make a finding that G.S. was at risk of harm; and the court erred in relying on the State's expert's conclusions.

E.S.'s arguments, however, are belied by the record and ignore that the court's opinion was based on evidence which "revealed far more reckless, dangerous, and wanton behaviors by [E.S.] relatively soon in time to that

14

medication event." The court first reasoned that failing to secure her medication may not, on its own, constitute neglect, however, the medication event coupled with E.S. driving under the influence while caring for G.S., is neglect. The court explained "[n]ow this [c]ourt would frown upon looking at events that were significantly attenuated in time from the situation at the time the Division acted, but here, such is not the case," and "the occasion of [G.S.'s] exposure to harmful substances as previously described is closely bracketed in time with [E.S.'s] own illegal drug use and . . . two months prior to a wanton and grossly negligent act of smoking crack and driving her child around." The court found, "by a preponderance of the evidence that the cumulative behaviors of [E.S.] placed or made [G.S.] a neglected or abused child, as defined in the law."

Having considered the evidence and finding the Division's expert and witnesses credible, the court found E.S. had failed to secure her medication, which led to G.S.'s ingestion of a narcotic, combined with E.S.'s admission that she had smoked crack cocaine and then drove G.S. while under the influence sufficient to conclude E.S. had abused or neglected G.S. We therefore reject E.S.'s argument the court based its finding on insufficient evidence.

We further reject E.S.'s second argument the court did not have sufficient support to determine she placed G.S. at risk of harm when she drove G.S. after

15

using drugs. We note that admitted relapse and drug use "is not, standing alone, sufficient to support a finding of abuse of neglect." N.J. Div. of Child Prot. & Permanency v. S.W., 488 N.J. Super. 180, 190 (App. Div. 2017). However, we are satisfied the court based its opinion on more than one prior instance of drug use or relapse. Again, the court conducted a thorough review of the evidence, including Division records, showing E.S. had repeatedly tested positive for various narcotics and placed G.S. at risk of harm.

Lastly, we briefly address the court's entry of the November 14, 2023 KLG order, which granted A.S. KLG.[3] We note only that the court entered the order following a hearing, which included the testimony of Division worker Doyle-Leach and A.S. The court made its findings and conclusions and noted that the order was entered with the consent of E.S.

In sum, applying the deferential standard of review accorded to Family Part matters, we discern no error in the court's findings of fact and conclusions of law determining E.S. abused or neglected G.S. To the extent that we have not addressed defendant's remaining arguments, including defendant's ineffective assistance of counsel claim, we find that they lack insufficient merit

---

[3] We address this issue because E.S. listed the November 14, 2023 order on her notice of appeal.

A-1274-23

to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

17